PEOPLE v KEVORKIAN

Docket No. 221758. Submitted September 11, 2001, at Detroit. Decided November 20, 2001, at 9:05 A.M. Leave to appeal denied, 465 Mich ___.

Jack Kevorkian was convicted by a jury in the Oakland Circuit Court, Jessica R. Cooper, J., of second-degree murder and delivering a controlled substance. The charges were based on the defendant's administration of lethal drugs to a person with the purpose of committing a "mercy killing" or euthanasia. The defendant appealed.

The Court of Appeals *held*:

1. The defendant abandoned on appeal his argument that the people have reserved the right to euthanasia under US Const, Am IX and Const 1963, art 1, § 23.

2. The right to privacy under US Const, Am XIV and Const 1963, art 1, § 17 does not include a right to commit or receive euthanasia so that an individual can be free from intolerable and irremediable suffering.

3. A patient's right to be free from intolerable and irremediable suffering, if one exists, does not migrate to an individual, such as the defendant, who provides assistance to a patient who is suffering interminably.

4. The defendant's argument that his trial attorney, while acting either as counsel or as standby counsel, failed to provide effective representation is not supported by the record.

5. The prosecutor did not engage in misconduct in referring to the defendant's decision to exercise his right to remain silent. The references were not direct and unequivocal references to the defendant's failure to testify but were proper objections to the defendant's repeated and improper attempts to inject into his closing argument facts that were not in evidence.

6. The trial court did not err in barring the defendant from calling two witnesses to testify at trial. The witnesses had no relevant evidence to offer and their testimony was inconsequential to the determination of the case.

Affirmed.

CONSTITUTIONAL LAW — EUTHANASIA — RIGHT TO PRIVACY.

    The constitutional right to privacy does not include a right to commit or receive euthanasia so that an individual can be free from intolerable and irremediable suffering (US Const, Am XIV; Const 1963, art 1, § 17).

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *David G. Gorcyca,* Prosecuting Attorney, *Joyce F. Todd,* Chief, Appellate Division, and *Anica Letica,* Assistant Prosecuting Attorney, for the people.

*Morganroth & Morganroth* (by *Mayer Morganroth, Jeffrey B. Morganroth,* and *Jason R. Hirsch*), for the defendant on appeal.

Before: HOEKSTRA, P.J., and SAAD and WHITBECK, JJ.

WHITBECK, J. A jury convicted defendant of second-degree murder[1] and delivering a controlled substance.[2] The trial court sentenced him to concurrent prison terms of ten to twenty-five years for the murder conviction and seven years for the controlled substance conviction. Defendant appeals as of right and we affirm.

## I. OVERVIEW

This case is about death; in particular, the death of former racecar driver Thomas Youk in September 1998. Youk was fifty-two years old and had amyotrophic lateral sclerosis (ALS), also known as Lou Gehrig's disease. Defendant twice videotaped himself interacting with Youk. In the first videotape, defendant went to Youk's home to discuss his condition. In

---

[1] MCL 750.317.

[2] MCL 333.7401(2)(b).

the second videotape, defendant administered a lethal drug to Youk. Defendant later was a guest on the television news show *60 Minutes*, during which segments from both videotapes were shown. The jury saw the videotapes and the *60 Minutes* interview at defendant's trial. Nevertheless, defendant attempted to persuade the jury not to convict him because the murder he was charged with committing was, in his view, a "mercy killing."

Given this factual setting, this appeal presents a fascinating paradox. Though he made an impassioned plea to the jury to adopt his views on euthanasia, in this appeal defendant has given almost no attention to his claim that this homicide had a legal justification or excuse. Indeed, exactly seven of the fifty pages in his brief to this Court address euthanasia. Even during oral arguments, defendant's appellate counsel made not a single reference to this issue.

Nevertheless, euthanasia is at the core of this case. But for defendant's self-described zealotry, Thomas Youk's death would, in all probability, not have been the subject of national attention, much less a murder trial. Defendant, in what is now apparently something of an afterthought, asks us to conclude that euthanasia is legal and, therefore, to reverse his conviction on constitutional grounds. We refuse. Such a holding would be the first step down a very steep and very slippery slope. To paraphrase the United States Supreme Court in *Washington v Glucksberg*,[3] it would expand the right to privacy to include a right to commit euthanasia and thus place the issue outside the arenas of public debate and legislative action. Such a

---

[3] *Washington v Glucksberg*, 521 US 702, 721; 117 S Ct 2258; 138 L Ed 2d 772 (1997).

holding would also involve the judiciary in deciding questions that are simply beyond our capacity. Succinctly put, there is no principled basis for us to legalize euthanasia.

Defendant's other issues are more mundane and we describe the relevant facts in more detail in the appropriate discussion sections. First, defendant asserts that his trial attorney, David Gorosh, did not provide him with his constitutional right to effective representation. However, defendant has failed to demonstrate that Gorosh performed deficiently at any time he actually acted as counsel. Defendant also failed to prove that Gorosh, while acting as standby counsel, took control of the case or did anything to destroy the jury's perception that defendant was representing himself. Even assuming for the sake of argument that a claim alleging ineffective assistance of standby counsel is legally cognizable, defendant still has not proved that Gorosh acted deficiently and prejudicially. Defendant chose—almost certainly unwisely but nevertheless knowingly, intelligently, voluntarily, and unequivocally—to represent himself. He cannot now assign the blame for his conviction to someone who did not act as his trial counsel.

Second, defendant claims that the prosecutor improperly referred to defendant's decision to exercise his right to remain silent, thereby denying him his rights under the Fifth Amendment. The remarks at issue were the prosecutor's proper objections to defendant's repeated and improper attempts to inject into his closing argument facts that were not in evidence. As such, the prosecutor's remarks were not direct and unequivocal references to defendant's failure to testify, and therefore, the making of those remarks did not constitute misconduct.

Third, defendant claims that the trial court erred in excluding the testimony of Terrence and Melody Youk, Thomas' brother and sister-in-law. However, defendant misreads the applicable standards with respect to res gestae witnesses and then fails entirely to demonstrate how the proposed testimony would have been relevant. Thus, even on this narrow evidentiary issue, defendant's arguments have no merit.

## II. THE DEATH OF THOMAS YOUK

### A. THE SEPTEMBER 15, 1998, VIDEOTAPE

On September 15, 1998, at 9:55 P.M., defendant went to Youk's home to discuss Youk's condition. As the videotape of this discussion revealed, defendant stated that he was recording their interaction in "connection with a request from Thomas [Youk] for help in . . . ending his suffering." Youk then described his condition. He recalled that his symptoms of ALS first became obvious to him in 1994 and that he had been confined to a wheelchair since 1997. By September 1998, Youk said, he could not move his left arm or his legs, he had minimal use of his right arm, he had difficulty swallowing and breathing, he was fed through a tube, and he was forced to use a machine to help him breathe. Youk stated that, at the time, he could not do anything for himself, that he had discussed "his wishes" with his mother, brothers, and wife, and that they "understand why. It's my decision."

Defendant then told Youk that he needed to sign a form indicating that he was consenting to a "direct injection instead of using the device, the machine." Defendant asked Youk if he wished to donate his

organs, and Youk declined. Defendant then read the consent form, which stated in part:

> I, Thomas Youk, the undersigned, entirely voluntarily, without any reservation, external persuasion, pressure, or duress, and after prolonged and thorough deliberation, hereby consent to the following medical procedure of my own choosing, and that you have chosen direct injection, or what they call active euthanasia, to be administered by a competent medical professional, in order to end with certainty my intolerable and hopelessly incurable suffering.

The meeting ended at 10:15 P.M.

### B. THE SEPTEMBER 16, 1998, VIDEOTAPE

On September 16, 1998, at 9:49 P.M., defendant again videotaped himself and Youk at Youk's home. Youk stated that he "wanted to go through with this" and signed the consent form. Defendant remarked that he would inject Youk in the vein because "it's quicker," and stated, "now I'm going to put on a cardiogram so we know when your heart is stopped, okay." Defendant established a connection between Youk and the electrocardiogram. Defendant injected Youk with Anectine and Seconal before injecting Youk with potassium chloride. During this time, defendant provided a commentary on what was occurring:

> Sleepy Tom? Tom are you asleep? And now we'll inject the Anectine. You asleep Tom? Tom? You asleep? He's asleep. Now the Potassium Chloride. This machine is recording for some reason so I'm pulling it by hand until the heart stops. It's been, it's been about two minutes since I injected the, ah, seconal, and one minute since I injected the—. Now we're getting agonal complexes and that's about the, the Potassium Chloride will stop the heart, so. Now there's a straight line. A straight line and the cardiogram will be turned off. His heart is stopped.

### C. CAUSE OF DEATH

The police were dispatched to Youk's house on September 17, 1998, at 1:30 A.M. They found Youk lying on his bed, dead. The police also found a Federal Express receipt with defendant's name at the scene. Officials conducted Youk's autopsy at 10:00 A.M. the same day. The medical examiner listed the manner of death as homicide and the cause of death as intravenous injection of substances. During the autopsy, the medical examiner found two "fresh" needle marks on Youk's left and right wrists that had been covered with makeup. The autopsy protocol stated that the cause of death was "poisoning by intravenous injection of substances."

Oakland County Medical Examiner Ljubisa J. Dragovic, an expert in neuropathology and pathology who later testified for the prosecution at defendant's trial, witnessed the autopsy. Dr. Dragovic found three significant drugs in Youk's bodily fluids. First, Youk had a high level of the barbiturate Seconal, also known as Secobarbital, in his blood. Seconal is a Schedule 2 controlled substance[4] typically used to induce sleep. Dr. Dragovic believed that the amount of Seconal in Youk's blood would have killed him in a few hours. Second, Dr. Dragovic found Anectine, a paralyzing muscle relaxant, present in Youk's body in an amount that could have killed Youk within five to eight minutes by causing brain death. However, Dr. Dragovic determined that it was the third drug, potassium chloride, that defendant injected into Youk that caused his death. As Dr. Dragovic explained, when

---

[4] Dr. Dragovic explained that the Board of Pharmacy *and* the Federal Drug Enforcement Agency must license a physician to prescribe Seconal.

potassium chloride is injected into the body in a concentrated form at once, rather than in small amounts over time, it stops the heart from beating within a matter of seconds. According to Dr. Dragovic, the toxicology reports did not reveal the presence of potassium chloride in Youk's body because that substance is naturally present in the body after red blood cells die.

Dr. Dragovic also confirmed that Youk had ALS. However, in Dr. Dragovic's opinion, Youk did not die from ALS, ALS was not an underlying cause of Youk's death, and ALS did not contribute to Youk's death in any way. Rather, Dr. Dragovic firmly reiterated that the poisons injected into Youk killed him, constituting a homicide.

### D. THE *60 MINUTES* INTERVIEW

News correspondent Mike Wallace interviewed defendant for *60 Minutes*. In the first clip from the interview shown to the jury, Wallace stated at the outset, "You killed him." Defendant responded: "I did, but it could be Manslaughter not Murder. It's not necessarily Murder. But it doesn't bother me what you call it. I know what it is. This could never be a crime in any society which deems itself enlightened." Defendant indicated that he was making an example of Youk. Wallace then suggested that Youk was initially a little reluctant because Youk "thought he was getting assisted suicide." Defendant replied that "this is better than assisted suicide, I explained that to him. It's better control."

Defendant also explained to Wallace the process leading to Youk's death. According to defendant, the first injection paralyzed Youk's muscles and slowed

his ability to take in oxygen. When the oxygen was "cut off" and Youk could not breathe, defendant injected the "potassium chloride to stop the heart." Defendant then told Wallace that "[e]ither they go or I go," apparently meaning that he would be acquitted for killing Youk or, if convicted, he would starve to death in prison. As defendant put it: "I've got to force them to act. They must charge me. Because if they do not, that means they don't think it's a crime. Because they don't need any more evidence do they? Do you have to dust for fingerprints on this[?]"

Wallace suggested that defendant was "engaged in a political, medical, macabre . . . publicity venture," and had a "ghoulish . . . desire to see the deed done." Defendant did not disagree with those assertions, stating: "Well, it could be, I, I can't argue with that. Maybe it is ghoulish. I don't know. It appears that way to you. I can't criticize you for that." In fact, defendant agreed with Wallace, emphasizing that "the main point is . . . that the deed be done." Evidently in response to the argument that legalizing euthanasia could be problematic in practice, defendant commented that "[e]verything can be abused. You learn from abuse, you punish the abuser, and then . . . if you want to control, you say that only certain doctors can do this in certain areas, nobody else. . . . That's the way to control it."

Defendant then returned to one of his main themes, saying:

> If you don't have liberty and self-determination, you got nothing. That's what this country's built on and this is the ultimate self-determination to determine when and how you're gonna die when you're suffering.
>
> [*Wallace*]: And those who say that [defendant], Dr. Death, is a fanatic?

[*Defendant*]: Zealot. No, not if, sure, you try to take a liberty away and I turn fanatic. . . . I'm fighting for me, Mike, me. This is a right I want when I, I'm 71, I'll be 71. You don't know what'll happen when you get older. I may end up terribly suffering. I want some colleague to be free to come and help me when I say the time has come. That's why I'm fighting for, me. Now that sounds selfish. And if it helps everybody else, so be it.

### III. EUTHANASIA AND THE CONSTITUTION

#### A. FACTS AND ARGUMENT

Before trial, defendant, relying on the Ninth Amendment,[5] filed a motion asking the trial court to dismiss the charges against him. Evidently, defendant intended to argue that the people had retained the right to active euthanasia. The trial court denied the motion on the grounds that it was untimely and that defendant had failed to cite any support for his argument. Defendant then filed an emergency application for leave to appeal the trial court's order with this Court. In addition to challenging the trial court's ruling, he also claimed that the prosecution violated the Michigan constitutional counterpart to the Ninth Amendment.[6] This Court ultimately determined that defendant failed to articulate the need for immediate appellate review.[7]

On appeal, defendant makes two related, but separate, constitutional arguments. First, he argues that the unenumerated rights protected by the Ninth Amendment and its Michigan constitutional counter-

---

[5] US Const, Am IX.

[6] Const 1963, art 1, § 23.

[7] *People v Kevorkian*, unpublished order of the Court of Appeals, entered March 16, 1999 (Docket No. 218077).

part[8] include a patient's right to be free from unbearable pain and suffering. Second, he maintains that the Fourteenth Amendment[9] and its Michigan constitutional counterpart[10] also include this right by proscribing state deprivation of liberty without due process of law either under constitutional privacy concepts or as a "necessary and direct corollary of this position . . . that a person should not be forced to suffer unbearably." Defendant claims that he has standing to raise these due process arguments. Defendant thus contends that he is entitled to have his murder conviction reversed and no further criminal proceedings instituted against him for "aiding in Thomas Youk's assertion of his constitutional right to be free from intolerable pain and suffering."

### B. STANDARD OF REVIEW

We review a trial court's decision to grant or deny a motion to dismiss charges for an abuse of discretion.[11] However, review de novo is appropriate for the core constitutional questions that underlie the trial court's ruling on the motion to dismiss the charges.[12]

### C. CONSTITUTIONAL PROVISIONS

The Ninth Amendment of the United States Constitution states that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."[13] The

---

[8] Const 1963, art 1, § 23.

[9] US Const, Am XIV.

[10] Const 1963, art 1, § 17.

[11] See *People v Adams*, 232 Mich App 128, 132; 591 NW2d 44 (1998).

[12] See *People v Houstina*, 216 Mich App 70, 73; 549 NW2d 11 (1996).

[13] US Const, Am IX.

counterpart provision in the Michigan Constitution states that "[t]he enumeration in this constitution of certain rights shall not be construed to deny or disparage others retained by the people."[14]

The Fourteenth Amendment of the United States Constitution states, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law."[15] The counterpart provision in the Michigan Constitution states, in relevant part, that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law."[16]

### D. THE NATURE OF DEFENDANT'S ARGUMENTS

At the outset it is important to understand the nature of defendant's constitutional claims. The best way to do this is to state clearly the constitutional arguments that defendant does *not* raise.

First, defendant does *not* ask us to hold that he acted properly in furtherance of the right to refuse life-sustaining medical treatment. In *Cruzan v Director, Missouri Dep't of Health*,[17] the United States Supreme Court "assume[d] that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition," likely under a Fourteenth Amendment due process liberty interest analysis.[18] More recently, in *Glucksberg*,[19] the Court strengthened the

---

[14] Const 1963, art 1, § 23.

[15] US Const, Am XIV.

[16] Const 1963, art 1, § 17.

[17] *Cruzan v Director, Missouri Dep't of Health*, 497 US 261, 279; 110 S Ct 2841; 111 L Ed 2d 224 (1990).

[18] *Id.* at 279, n 7.

[19] *Glucksberg, supra* at 721, n 17.

constitutional basis for the *Cruzan* decision, interpreting *Cruzan* as holding that "the right to refuse unwanted medical treatment was so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." Here, defendant does not, and could not, rely on *Cruzan*; factually, this case does not involve removing life support. Further, though not resting their decisions precisely on the Fourteenth Amendment, Michigan courts have arrived at the same conclusion regarding a patient's right to refuse life-sustaining medical care.[20] The limited scope of these cases does not establish a right to be free from unbearable pain and suffering that would make euthanasia legal. There is, of course, a substantial factual distinction between refusing care, even if doing so hastens death, and purposefully ending a life.

Second, defendant does *not* make any claim that this case concerns medical efforts to relieve pain or discomfort, though these medical efforts may hasten death. Michigan exempts such medical efforts from criminal penalties.[21] Importantly, however, the exemption does not apply to medical efforts designed to *cause* death.[22] Factually, there is not a scintilla of evidence that defendant administered potassium chloride to Youk to relieve Youk's pain or discomfort. Defendant admits as much in his brief on appeal:

---

[20] See *In re Martin*, 450 Mich 204, 215-216; 538 NW2d 399 (1995), discussing *In re Rosebush*, 195 Mich App 675; 491 NW2d 633 (1992).

[21] See MCL 752.1027(b)(3) ("[P]rescribing, dispensing, or administering medications or procedures if the intent is to relieve pain or discomfort and *not to cause death*, even if the medication or procedure may hasten or increase the risk of death" is not the felony of assisted suicide.) (emphasis added).

[22] *Id.*

> The only medical relief for Thomas Youk's conditions was the relief that he sought from [defendant]. The injection [defendant] gave to Thomas Youk was the only effective medical way to alleviate Thomas Youk's unbearable suffering. *No pain medication would suffice, and there was no other beneficial medical alternative that would have aided Thomas Youk.*[23]

Third, defendant does *not* ask us to find that his actions in this matter constituted some form of permissible assisted suicide. In Michigan, assisting in a suicide—that is, providing the physical means by which another person attempts or commits suicide or participating in a physical act by which another person attempts or commits suicide—is illegal.[24] The Michigan Supreme Court has upheld the statute in question against both a Title-Object Clause challenge under the Michigan Constitution and a Due Process Clause challenge under the United States Constitution.[25] In reaching its decision on the due process challenge, a majority of the Court observed:

> 'Presently, a substantial number of jurisdictions have specific statutes that criminalize assisted suicide and the Model Penal Code also provides for criminal penalties. Further, nearly all states expressly disapprove of suicide and assisted suicide either in statutes dealing with durable powers of attorney in health-care situations, or in "living will" statutes. In addition, all states provide for the involuntary commitment of persons who may harm themselves as the result of mental illness, and a number of states allow the use of nondeadly force to thwart suicide attempts.[26]

---

[23] Emphasis supplied.

[24] See MCL 752.1027.

[25] *People v Kevorkian,* 447 Mich 436, 445-446; 527 NW2d 714 (1994) (*Kevorkian I*).

[26] *Id.* at 478-479; Justices CAVANAGH, BRICKLEY, and GRIFFIN, joined by Justices BOYLE and RILEY.

Referring to *Cruzan*, the majority observed:

> Indeed, the United States Supreme Court repeatedly and unequivocally has affirmed the sanctity of human life and rejected the notion that there is a right of self-destruction inherent in any common-law doctrine or constitutional phrase.[27]

Several years after the Michigan Supreme Court decision in *Kevorkian I*, the United States Supreme Court in *Glucksberg* upheld a similar Washington statute against a similar Due Process Clause challenge under the United States Constitution.[28] The *Glucksberg* majority held that the prohibition in the Washington statute against " 'caus[ing]' " or " 'aid[ing]' " a suicide did not offend the Fourteenth Amendment of the United States Constitution.[29]

Here, defendant makes no attempt to assert that he was engaged in assisted suicide when he injected Youk with potassium chloride, causing his death. Rather, he asserts that if the Ninth Amendment "is to have any substantive meaning," the right to be free from inexorable pain and suffering must be among the unenumerated rights protected by that amendment and its Michigan counterpart. Further, defendant asserts that the right to be free from unbearable pain and suffering caused by a medical condition is inherently part of the liberty interests secured by the Fourteenth Amendment and its Michigan counterpart. Defendant then contends that he cannot be prosecuted for "aiding in Thomas Youk's assertion of his

---

[27] *Id.* at 480-481.

[28] In *Vacco v Quill*, 521 US 793; 117 S Ct 2293; 138 L Ed 2d 834 (1997), decided the same day, the Court upheld New York's assisted suicide ban against an Equal Protection Clause challenge.

[29] *Glucksberg, supra* at 705-706.

constitutional right to be free from intolerable pain and suffering." Although defendant's appellate counsel has carefully avoided using the words, as we have already noted, the record indicates that defendant was quite specific when describing his actions; he said he was engaged in "active euthanasia" and the consent form that Youk signed directly refers to such active euthanasia.

In summary, defendant does not, nor could he, ask us to hold that his actions were legally justifiable because he simply helped Youk exercise his right to refuse medical care. Defendant does not, nor could he, ask us to hold that he was lawfully attempting to alleviate Youk's pain and suffering by any means other than causing his death. Defendant does not, nor could he, ask us to hold that his actions constituted a legal form of assisted suicide. In a nutshell, and using his own terminology, defendant asks us to legalize euthanasia.

### E. RESERVED RIGHTS

Defendant's argument that the people have reserved the right to euthanasia under the Ninth Amendment and its Michigan counterpart is basically formless. He states that a right to be free from inexorable pain and suffering "must be among" the rights protected by these two constitutional provisions. Further, he argues that states "should recognize such a right and give it force." Defendant does not cite a single case for this extraordinary request. As the Supreme Court said in *Mitcham v Detroit*,[30]

---

[30] *Mitcham v Detroit*, 355 Mich 182; 94 NW2d 388 (1959).

It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. Failure to brief a question on appeal is tantamount to abandoning it.[31]

We conclude, therefore, that defendant has abandoned this argument on appeal.

### F. EUTHANASIA AS A DUE PROCESS RIGHT TO PRIVACY

#### (1) DEFENDANT'S ARGUMENT

Defendant starts with the proposition that there is a right to privacy that is part of the liberty interest protected by the Fourteenth Amendment and its Michigan counterpart. He then asserts that the "intensely personal and private right of a patient to be free from intolerable and irremediable suffering" is either part of or similar to this privacy right. Citing *Vacco*, he argues that if the administration of aggressive painkilling drugs is acceptable even if this may hasten death, then the "necessary and direct corollary of this position is that a person should not be forced to suffer unbearably."

Defendant then reviews the positions of Justices O'Connor, Breyer, Souter, and Stevens in *Glucksberg* to reach the conclusion that "Justices on the Supreme Court have suggested allowing for interpretation of the Fourteenth Amendment's guarantee of liberty to apply to various privacy rights, including those

---

[31] *Id.* at 203 (citations omitted).

related to personal and private medical procedures."[32] Finally, defendant argues that he has standing to assert Youk's constitutional right to be free from intolerable pain, claiming that Justice Stevens in *Glucksberg*,[33] "recognized the possibility that an individual who provides assistance to a patient who was suffering interminably could prevail on a Constitutional challenge" and that, if we agree that there is a constitutionally protected right to be free from unbearable suffering, then the charges against him must be dismissed. We do not agree.

### (2) ENCOMPASSING EUTHANASIA WITHIN THE RIGHT TO PRIVACY

It is one thing to assert, as defendant does, that there is a large body of case law suggesting that due process sometimes relies on the right to privacy to protect fundamental liberty interests.[34] It is quite another thing, however, to conclude that the right to privacy encompasses euthanasia. As Justice Jackson once pointedly noted, the enduring nature of precedent gives judicial opinions a force all their own.[35]

> The principle then lies about like a loaded weapon . . . . Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes. All who observe the work of courts are familiar with what Judge

---

[32] This argument reflects defendant's remarks on the second day of trial in which he asserted that justices of the United States Supreme Court want a particularized case and that "Four of them said we want to revisit this issue again."

[33] *Glucksberg, supra* at 750.

[34] We need not address the question whether there is, in fact, a right to privacy under the United States and Michigan Constitutions; for the purposes of dealing with defendant's arguments here, we have assumed the existence of such a right.

[35] *Korematsu v United States*, 323 US 214, 246; 65 S Ct 193; 89 L Ed 194 (1944) (Jackson, J., dissenting).

Cardozo described as "the tendency of a principle to expand itself to the limit of its logic."[36]

Defendant urges us to pick up the loaded weapon of the right to privacy cases. He asks us to use this weapon to resolve the situation faced by a person who suffers from literally unbearable pain and who wishes to end that pain by dying. As Justice O'Connor described it: "Death will be different for each of us. For many, the last days will be spent in physical pain and perhaps the despair that accompanies physical deterioration and a loss of control of basic bodily and mental functions."[37]

We decline, however, to pick up this loaded weapon for three basic reasons. First, we can find no meaningful precedent for expanding the right to privacy to include a right to commit euthanasia so that an individual can be free from intolerable and irremediable suffering. To our knowledge, no court of last resort in this country has ever recognized such a right. Even in the assisted suicide cases dealing with an asserted "right to die," courts have steadfastly refused to expand the right to privacy to include the right to commit or receive euthanasia. As Chief Justice CAVANAGH and Justices BRICKLEY and GRIFFIN explained while describing the boundaries of the right to privacy in end-of-life cases:

We do not discern in *Cruzan* and its historic roots an indication that the federal constitution protects a right more expansive than the right to refuse to begin or to continue life-sustaining medical treatment. Neither do we find in [*Planned Parenthood of Southeastern Pennsylvania v Casey*, 505 US 833; 112 S Ct 2791; 120 L Ed 2d 674 (1992)]

---

[36] *Id.*, quoting Cardozo, *Nature of the Judicial Process* (1932), p 51.

[37] *Glucksberg, supra* at 736.

or in the precedent from which it evolved an intent to expand the liberty interests identified by the Court in such a manner.[38]

Similarly, in *Glucksberg*, a majority of the United States Supreme Court concluded that the asserted "right" to assistance in committing suicide "is not a fundamental liberty interest protected by the Due Process Clause."[39] Instead, the Court determined that a state has legitimate and countervailing interests in preserving life,[40] preventing suicide,[41] protecting the integrity and ethics of the medical profession, protecting vulnerable groups from abuse, neglect, and mistakes,[42] and acknowledging the equal value of all people.[43] Most importantly, the *Glucksberg* majority noted that states "may fear that permitting assisted suicide will start it down the path to voluntary and perhaps even involuntary euthanasia."[44] In commenting on the Ninth Circuit Court of Appeals decision in the underlying case,[45] the majority of the Court said:

---

[38] *Kevorkian I, supra* at 465 (CAVANAGH, C.J., and BRICKLEY and GRIFFIN, JJ.).

[39] *Glucksberg, supra* at 728.

[40] *Id.*, noting that the Model Penal Code, § 210.5, Comment 5, p 100 states that " '[T]he interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another.' "

[41] *Glucksberg, supra* at 730, citing H. Hendin, *Seduced by Death: Doctors, Patients and the Dutch Cure,* 24-25 (1997) ("Research indicates, however, that many people who request physician-assisted suicide withdraw that request if their depression and pain are treated.").

[42] *Glucksberg, supra* at 731, quoting the Council on Ethical and Judicial Affairs, *Decisions Near the End of Life,* 267 JAMA 2229, 2233 (1992) (" '[T]he societal risk of involving physicians in medical interventions to cause patients' deaths is too great.' ").

[43] *Glucksberg, supra* at 728-732.

[44] *Id.* at 732.

[45] *Compassion in Dying v Washington,* 79 F3d 790 (CA 9, 1996).

The Court of Appeals' decision, and its expansive reasoning, provide ample support for the [state of Washington's] concerns. The court noted, for example, that the "decision of a duly appointed surrogate decision maker is for all legal purposes the decision of the patient himself;" that "in some instances, the patient may be unable to self-administer the drugs and . . . administration by the physician . . . may be the only way the patient may be able to receive them;" and that not only physicians, but also family members and loved ones, will inevitably participate in assisting suicide. Thus, it turns out that what is couched as a limited right to "physician-assisted suicide" is likely, in effect, a much broader license, which could prove extremely difficult to police and contain. [The state of] Washington's ban on assisting suicide prevents such erosion.[46]

The majority then turned, directly, to the "slippery slope" argument. The majority cited *United States v 12 200-ft Reels of Super 8 MM Film*[47] for the proposition that " '[e]ach step, when taken, appear[s] a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance.' "[48] The majority referred to *Physician-Assisted Suicide and Euthanasia in the Netherlands*[49] as suggesting that

despite the existence of various reporting procedures, euthanasia in the Netherlands has not been limited to com-

---

[46] *Glucksberg, supra* at 733 (citations omitted).

[47] *United States v 12 200-ft Reels of Super 8 MM Film*, 413 US 123, 127; 93 S Ct 2665; 37 L Ed 2d 500 (1973).

[48] *Glucksberg, supra* at 735. The Court also referred to Justice Cardozo's observation in *The Nature of the Judicial Process*, 51 (1932) of " '[t]he tendency of a principle to expand itself to the limit of its logic.' " *Glucksberg, supra* at 733, n 23.

[49] A Report of Chairman Charles T. Canady to the Subcommittee on the Constitution of the House Committee on the Judiciary, 104th Cong, 2d Sess (Comm Print, 1966), pp 16-21.

petent, terminally ill adults who are enduring physical suf-
fering, and that regulation of the practice may not have pre-
vented abuses in cases involving vulnerable persons, includ-
ing severely disabled neonates and elderly persons suffering
from dementia.[50]

Here, expanding the right to privacy would begin, as
the steps in the progression of defendant's argument
supporting voluntary euthanasia clearly indicate, the
slide down the slippery slope toward euthanasia. No
court of final jurisdiction has so expanded the right to
privacy. As a state court of intermediate appellate
jurisdiction, neither will we.

Second, we conclude that by expanding the right to
privacy as defendant suggests, we would, to a great
extent, place the matter outside the arenas of public
debate and legislative action.[51] Whatever the life
experiences or the policy preferences of the members
of this Court might be, we must exercise the utmost
care to assure, when asked to break new ground, that
the liberty protected by the Due Process Clause of
the Fourteenth Amendment not be subtly transformed
into an expression of personal belief rather than an
adherence to the rule of law.[52] If society is to recog-
nize a right to be free from intolerable and irremedi-
able suffering, it should do so through the action of
the majority of the legislature, whose role it is to set
social policy,[53] or by action of the people through bal-
lot initiative. As the Michigan Supreme Court ob-
served when analyzing the constitutionality of the
prohibition of assisted suicide:

---

[50] *Glucksberg, supra* at 734.

[51] *Id.* at 720.

[52] See *Moore v East Cleveland, Ohio*, 431 US 494, 502; 97 S Ct 1932; 52
L Ed 2d 531 (1977) (plurality opinion).

[53] See *Taylor v Kurapati*, 236 Mich App 315, 355; 600 NW2d 670 (1999).

> We are keenly aware of the intense emotions and compet-
> ing moral philosophies that characterize the present debate
> about suicide in general, and assisted suicide in particular.
> The issues do not lend themselves to simple answers. How-
> ever, while the complexity of the matter does not permit us
> to avoid the critical constitutional questions, neither does it,
> under the guise of constitutional interpretation, permit us to
> expand the judicial powers of this Court, especially where
> the question clearly is a policy one that is appropriately left
> to the citizenry for resolution, either through its elected
> representatives or through a ballot initiative under Const
> 1963, art 2, § 9.[54]

Third, we observe that by expanding the right of privacy to include a right to commit euthanasia in order to end intolerable and irremediable suffering we would inevitably involve the judiciary in deciding questions that are simply beyond its capacity. There is no court that can answer the question of how *much* pain, or perception of pain by a third party, is necessary before the suffering becomes intolerable and irremediable. The role of the courts is to serve neither as physicians nor as theologians. In *Glucksberg*, Justice Stevens briefly discussed the United States Supreme Court's changing attitude toward the death penalty, noting that "there is no absolute requirement that a State treat all human life as having an equal right to preservation."[55] Though other jurisdictions may not value all life equally, that is not true in Michigan.[56] In a state that constitutionally prohibits

---

[54] *Kevorkian I, supra* at 481-482; see also *In re Certified Question (Marlinga v Kevorkian)*, 456 Mich 1223; 575 NW2d 550 (1998); *Kevorkian v American Medical Ass'n*, 237 Mich App 1; 602 NW2d 233 (1999); *People ex rel Oakland Co Prosecuting Attorney v Kevorkian*, 210 Mich App 601; 534 NW2d 172 (1995).

[55] *Glucksberg, supra* at 738.

[56] See, generally, *Taylor, supra*.

putting to death the convicted perpetrator of even the most heinous of crimes,[57] courts are simply unsuited to make that decision with respect to the innocent. No judge, no matter how learned, can assess the quality of human life and determine, as a matter of law, that putting an end to suffering is justifiable in one case while in another case it is not. This sort of subjective determination would be unavoidable if we begin, through judicial intervention, to decide who shall live and who shall die.

Rather, the role of the courts is to apply the rule of law. As Chief Justice Burger once eloquently explained:

It is often observed that hard cases make bad law. I suspect there is some truth to that adage, for the "hard" cases always tempt judges to exceed the limits of their authority . . . to reach a "desirable" result. Cardozo no doubt had this type of case in mind when he wrote:

"The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains." The Nature of the Judicial Process, 141 (1921).

What Cardozo tells us is beware the "good result," achieved by judicially unauthorized or intellectually dishonest means on the appealing notion that the desirable ends justify the improper judicial means. For there is always the danger that the seeds of precedent sown by

---

[57] See Const 1963, art 4, § 46; *Glucksberg, supra* at 741 (Stevens, J., concurring) (emphasizing the incompatibility of Washington's argument that life must be saved with the fact that it has the death penalty).

good men for the best of motives will yield a rich harvest of unprincipled acts of others also aiming at "good ends."[58]

Simply put, the courts are not free to create new rights out of whole cloth. We will not do so here.

### (3) "A MORE PARTICULARIZED CHALLENGE"

The structure of the *Glucksberg* opinion reflects the complexity of the assisted suicide issue, an issue certainly less complex than euthanasia. In *Glucksberg*, Chief Justice Rehnquist wrote the opinion announcing the Court's decision. Justices O'Connor, Scalia, Kennedy, and Thomas joined this opinion, constituting a solid five-person majority. Nevertheless, *Glucksberg* consists of more than the majority opinion. Justice O'Connor wrote a concurrence, which Justices Ginsburg and Breyer joined. At the same time, Justices Stevens, Souter, Ginsburg, and Breyer each wrote their own concurring opinions. Thus, while the majority opinion in *Glucksberg* is plainly identifiable, the nine individual justices' views on the assisted suicide issue are far from uniform.

Defendant seizes on these concurrences in *Glucksberg* as evidence that the United States Supreme Court would find a constitutional basis for assisted suicide if presented with "a more particularized challenge." Defendant's assumption is that this is the perfect test case; this is the "more particularized challenge"[59] that will bring sweeping changes to constitutional law affecting not only assisted suicide, but creating a right to commit euthanasia. As we have

---

[58] See *United Steelworkers of America, AFL-CIO-CLC v Weber*, 443 US 193, 218-219; 99 S Ct 2721; 61 L Ed 2d 480 (1979) (Burger, C.J., dissenting).

[59] *Glucksberg, supra* at 750 (Stevens, J., concurring).

already outlined, assisted suicide is not at issue here; rather, the fundamental question here is whether there is a right to commit euthanasia. Defendant's observation that the concurring justices in *Glucksberg* each expressed, in varying degrees, their reservations about the sweep of the majority opinion is accurate. However, as is profoundly clear from each of their concurring opinions, there is not a hint in *any* of the language that *any* of the concurring justices used that *any* of them would recognize a right to commit euthanasia.

Justice O'Connor attempted to avoid dealing directly with the limits on a patient's right to avoid suffering, writing:

> [T]here is no need to address the question whether suffering patients have a constitutionally cognizable interest in obtaining relief from the suffering that they may experience in the last days of their lives. There is no dispute that dying patients in Washington and New York can obtain palliative care, even when doing so would hasten their deaths. The difficulty in defining terminal illness and the risk that a dying patient's request for assistance in ending his or her life might not be truly voluntary justifies the prohibitions on assisted suicide we uphold here.[60]

However, she also agreed with the majority that "there is no generalized right to 'commit suicide,' "[61] and that the "State's interests in protecting those who are not truly competent or facing imminent death, or those whose decisions to hasten death would not truly be voluntary, are sufficiently weighty to justify a prohibition against physician-assisted suicide."[62]

---

[60] *Id.* at 737-738 (O'Connor, J., concurring).

[61] *Id.* at 736.

[62] *Id.* at 737.

Justice Ginsburg's concurrence consisted of the single statement that she "concur[red] in the Court's judgments . . . substantially for the reasons stated by Justice O'Connor . . . ."

Justice Breyer disagreed with the way the majority framed the issue on appeal as the right to assisted suicide, instead preferring to examine whether a " 'right to die with dignity' " existed.[63] Despite reframing this issue, as "rough"[64] as it was, Justice Breyer ultimately adopted a tack quite close to that of Justice O'Connor, stating:

> I do not believe . . . that this Court need or now should decide whether or not such a right [to die with dignity] is "fundamental." That is because, in my view, the avoidance of severe physical pain (connected with death) would have to constitute an essential part of any successful claim and because . . .the laws before us do not *force* a dying person to undergo that kind of pain. . . .
>
> \*     \*     \*
>
> Were the legal circumstances different—for example, were state law to prevent the provision of palliative care, including the administration of drugs as needed to avoid pain at the end of life—then the law's impact upon serious and otherwise unavoidable physical pain (accompanying death) would be more directly at issue. And . . . the Court might have to revisit its conclusions in these cases.[65]

Thus, Justice Breyer's concurrence implies that he, too, believes that the state has a legally cognizable interest in preventing death, even when it is desired, as long as the state does not bar other efforts to alleviate suffering.

---

[63] *Id.* at 790 (Breyer, J., concurring).

[64] *Id.*

[65] *Id.* at 791-792.

Justice Souter's concerns were somewhat different. He drew parallels between the right to "bodily integrity" and patients' insistence that they not merely be drugged into a "stupor" to make them unaware of their pain, but that they had a right to exercise their autonomy by dying, in the process avoiding "helplessness" and "dependency."[66] In this regard, he noted that a physician is not just a "mechanic of the human body," but one who "ministers" to patients as whole individuals.[67] Justice Souter reflected on the complexity and necessity of the patient-physician relationship in times of great suffering, refusing to minimize the individual interests at stake.[68] Justice Souter did not close forever the doors to the Court regarding the assisted suicide issue. However, in the end, he concluded that the legislature, not the Court, had the "institutional competence" to address this issue.[69]

Nevertheless, Justice Souter emphasized time and again the risk that acknowledging a right to assisted suicide would lead to legalized euthanasia. He clearly saw euthanasia as having "dangers [that] are concededly within the State's authority to address."[70] Justice Souter, in a telling statement, also noted that "the barrier between assisted suicide and euthanasia could become porous [if there were a right to assisted suicide], and the line between voluntary and involuntary euthanasia as well."[71] Thus, while Justice Souter was able to see many shades of gray in the assisted suicide issue, he saw euthanasia as pure darkness.

---

[66] See *id.* at 777-779 (Souter, J., concurring).

[67] *Id.* at 779.

[68] *Id.* at 782.

[69] *Id.* at 789.

[70] *Id.* at 755.

[71] *Id.* at 785.

Justice Stevens distinguished between challenging a statute as facially unconstitutional and challenging the constitutionality of its application when framing the issues in the appeal,[72] stating:

[J]ust as our conclusion that capital punishment is not always unconstitutional did not preclude later decisions holding that it is sometimes impermissibly cruel, so is it equally clear that a decision upholding a general statutory prohibition of assisted 'suicide does not mean that every possible application of the statute would be valid. A State, like Washington, that has authorized the death penalty, and thereby has concluded that the sanctity of human life does not require that it always be preserved, must acknowledge that *there are situations in which an interest in hastening death is legitimate. Indeed, not only is that interest sometimes legitimate, I am also convinced that there are times when it is entitled to constitutional protection.*[73]

Of all the justices, Justice Stevens' view in this and other passages came the closest to reflecting on the notion that a possible constitutional right to commit euthanasia might exist. However, we cannot forget that Justice Stevens, in fact, concurred in the majority's opinion. He readily acknowledged the majority's conclusion that there were principled reasons for "refusing to recognize an open-ended constitutional right to commit suicide," including assistance in committing suicide.[74] He also found persuasive John Donne's famous statement that " 'No man · is an island,' " commenting:

The State has an interest in preserving and fostering the benefits that every human being may provide to the com-

---

[72] *Id.* at 739-740 (Stevens, J., concurring).

[73] *Id.* at 741-742.

[74] *Id.* at 740, 741.

munity—a community that thrives on the exchange of ideas, expressions of affection, shared memories, and humorous incidents, as well as on the material contributions that its members create and support. *The value to others of a person's life is far too precious to allow the individual to claim a constitutional entitlement to complete autonomy in making a decision to end that life.*[75]

Further, Justice Stevens clearly expressed his views in the context of the right to end the life of a person for whom death is relatively imminent. In fact, after delineating the state's legitimate interests in preventing assisted suicide, Justice Stevens not only declined to say "as a categorical matter that these state interests are invalid," he made the statement with respect to "the entire class of *terminally ill*, mentally competent patients."[76] More importantly, nowhere in his concurrence did Justice Stevens consider whether a right to commit euthanasia exists. Even if in the future Justice Stevens would hold that the United States Constitution grants a right to physician-assisted suicide, it appears that he would limit the right to the terminally ill and would not extend it to euthanasia.

These five concurring justices held in common a concern that the states neither bar adequate treatment for pain and suffering in the name of prohibiting assisted suicide nor force patients to receive unwanted medical treatment. Here, defendant asserts that "no pain medication would suffice" and that "there was no other beneficial medical alternative that would have aided Thomas Youk." Defendant's

---

[75] *Id.* at 741 (emphasis added).

[76] *Id.* at 750 (emphasis added).

own words take him well beyond the possible purview of the concurring justices in *Glucksberg*.

(4) THE "DUTCH CURE"

Finally, defendant urges us to recognize that his prosecution "for helping Thomas Youk put an end to his suffering at the request of Mr. Youk" is unconstitutional on its face. He arrives at this position by asserting, first, that Youk had a constitutional right to be free from intolerable pain and, second, that defendant's provision of "Constitutionally guaranteed medical services" allows him to assert Youk's rights.

There is no authority whatsoever for the proposition that a right to be free from intolerable and irremediable suffering, if it exists, somehow migrates to an "individual," such as defendant, who provides assistance to a patient who is suffering interminably. The thin reed on which defendant apparently relies is Justice Stevens' concurrence in *Glucksberg*:

> There may be little distinction between the intent of a terminally ill patient who decides to remove her life support and one who seeks the assistance of a doctor in ending her life; in both situations, the patient is seeking to hasten a certain, impending death. The doctor's intent might also be the same in prescribing lethal medication as it is in terminating life support. A doctor who fails to administer medical treatment to one who is dying from a disease could be doing so with an intent to harm or kill that patient. Conversely, a doctor who prescribes lethal medication does not necessarily intend the patient's death—rather that doctor may seek simply to ease the patient's suffering and to comply with her wishes. The illusory character of any differences in intent or causation is confirmed by the fact that the American Medical Association unequivocally endorses the practice of terminal sedation—the administration of sufficient dosages of pain-killing medication to terminally ill

> patients to protect them from excruciating pain even when it is clear that the time of death will be advanced. The purpose of terminal sedation is to ease the suffering of the patient and comply with her wishes, and the actual cause of death is the administration of heavy doses of lethal sedatives. The same intent and causation may exist when a doctor complies with a patient's request for lethal medication to hasten her death.[77]

We first note Justice Stevens' equivocal language: "[t]here *may* be little distinction" between the intent of a terminally ill patient who decides to remove life support and one who seeks the assistance of a doctor to end her life; a doctor "*may* seek simply to ease the patient's suffering;" "[t]he same intent and causation *may* exist when a doctor complies with a patient's request for lethal medication . . . ." Such language is worlds away from a justification for euthanasia.

Second, we note that Justice Stevens' references are entirely within the context of a *doctor* treating a *patient*. Defendant is not licensed to practice medicine in Michigan. Therefore there was not, and could not be, a doctor-patient relationship between defendant and Youk. Defendant's argument can only be construed to mean that an *individual* can, if requested by another person, kill that person.

This is the mercy killing argument—the argument for the "Dutch cure"—taken beyond the position of even its most extreme advocates. Under defendant's theory, if one who is not a doctor became convinced that one's dear friend was suffering from a painful, incurable disease and that the friend wished to die, one could at the request of that friend shoot him between the eyes with a .45 caliber pistol and not be

---

[77] *Glucksberg, supra* at 750-751.

guilty of murder. Indeed, under defendant's theory, the same result might well be obtained if one's friend were severely depressed, or perhaps simply unhappy with his lot in life. This is the slippery slope with a vengeance and we will not take a single step down it, into the abyss.

### G. CONCLUSION

We conclude by noting that the jury, no doubt influenced by the gritty realism of the videotapes defendant made as well as his flat statement of culpability in the *60 Minutes* interview, convicted defendant of second-degree murder as well as delivery of a controlled substance. Defendant has on the record before us compared himself to Margaret Sanger, Susan B. Anthony, and Dr. Martin Luther King, Jr., all of whom risked imprisonment for their beliefs. How history will view defendant is a matter this Court can neither predict nor decide. Perhaps in the brave new world of defendant's "enlightened" society, acts such as the one he committed in this case will be excused. Still, we find it difficult to hypothesize a rule of law under which this might be so.

We deal here, however, with the application of the law as it currently exists to the facts of this case. While defendant has carefully skirted the label of murder in his past actions, he cannot do so now. Justice LEVIN once stated that "[defendant] is not a murderer."[78] Here, defendant in essence convicted himself of a murder he surely committed. We will not now reverse that conviction on due process grounds.

---

[78] See *Kevorkian I, supra* at 514 (LEVIN, J., concurring in part and dissenting in part).

The trial court did not abuse its discretion in refusing to dismiss the charges.

### IV. DEFENSE COUNSEL

#### A. FACTS AND ARGUMENTS

Before trial, defendant retained Gorosh to serve as his defense attorney. However, at the December 9, 1998, preliminary examination, defendant indicated that he was waiving his right to represent himself "[a]t this hearing[.]" Consequently, Gorosh and attorney Lisa Dwyer[79] entered their appearances in the trial court on defendant's behalf. Later, however, at a proceeding in the trial court's chambers, there was some indication that defendant might seek to proceed in propria persona. Indeed, on March 19, 1999, Gorosh informed the trial court that he believed defendant intended to "say he's going to conduct the trial in its entirety on his own in pro per."

In any event, while defendant did file one motion on his own behalf, it is apparent that Gorosh and Dwyer represented defendant at all times through the first day of trial on March 22, 1999. On that day, both Gorosh and Dwyer placed their appearances on the record on behalf of defendant. However, Gorosh then stated to the trial court that defendant "does want to represent himself in the trial in its entirety." In response to the trial court's questioning, defendant first stated that he was dissatisfied with Gorosh and Dwyer, prompting a colloquy in which he completely revised this statement:

---

[79] How or why Dwyer also became defendant's attorney is not clear from the record.

> *The Court*: And do you have any reason for this dissatisfaction?
>
> [*Defendant*]: There's no dissatisfaction. This is what I planned all along.
>
> *The Court*: You planned all along to represent yourself?
>
> [*Defendant*]: To represent myself, yes.
>
> *The Court*: And so you have no independent dissatisfaction with your attorney?
>
> [*Defendant*]: None.

After clearing up this point, the trial court explained to defendant that he could spend the rest of his life in prison and that a criminal trial is a formal, complex, and dynamic proceeding. Further, the trial court noted, the rules of evidence applied, as well as "certain decorum and certain ways in which there are presentations made to the jury and certain things that you can say and you can't say." The trial court asked defendant whether there was a specific reason that he wished to represent himself and he answered, "Yes."

> *The Court*: What is that, sir?
>
> [*Defendant*]: There are certain points I could bring out better than any attorney. Certain questions I can ask that are more pertinent.

The trial court informed defendant that, with respect to jury selection, opening statements, and closing statements, he would be bound by the rules of the court and that there would be a permanent record that might be used in other proceedings. The trial court stated that counsel could be present at the table with defendant in order to consult with, but that such advisors "can't get up and speak."

> [*Defendant*]: No, I said as advisors, consultation and advice. That's what I meant.

*The Court*: And that's what you wish to do?

[*Defendant*]: Yes.

*The Court*: You're aware of all of these dangers?

[*Defendant*]: Very much so.

*The Court*: You understand we're talking about something that could carry a sentence of life imprisonment without any possibility of parole?

[*Defendant*]: Yes.

*The Court*: And do you understand that you may not disrupt or inconvenience the Court?

[*Defendant*]: I'm here by my own invitation. I'll act like the guest I am.

*The Court*: And that means you will follow my orders and procedures?

[*Defendant*]: As a guest.

*The Court*: Well, it's more than a guest. You're here as a defendant, sir.

[*Defendant*]: But as a guest, propriety will be observed.

*The Court*: Has anyone promised you or threatened you in any way that makes you want to do this?

[*Defendant*]: No, not at all. It's my own free will.

In light of this exchange, the trial court determined that defendant had unequivocally, knowingly, intelligently, and voluntarily waived his right to counsel. Defendant then represented himself during jury voir dire and gave his own opening statement. On March 23, 1999, the second day of trial, before any witnesses were presented, the trial court again asked defendant if he still wished to proceed in propria persona. Defendant indicated that he still wished to represent himself, and did so by examining and cross-examining the witnesses. During a conference on the record in chambers on that day, the trial court again pointed out the difficulties of self-representation, to which defendant replied:

I don't want you to agonize, I really don't. Do what you know is right, do it forcefully and definitely. It won't offend me and if you think I'm making mistakes or I don't know what I'm doing, I'll do the best I can with my advisers here. I made this choice. I don't blame anybody else, and I don't want you to agonize over it. And I don't want you to jeopardize your position.

The trial court again raised the specter of punishment with defendant:

*The Court*: . . . I just want you to understand that if you're convicted of this offense it's the rest of your life.

[*Defendant*]: I go to jail. I go to jail, yes. I go to jail.

*The Court*: Mandatory.

[*Defendant*]: If I'm convicted, Your Honor, we get a shot at the Supreme Court. Not that they'll accept it, but we get a shot at it with what they want, a particularized case. They said that, we got their quotes. They want a particularized case. Four of them said we want to revisit this issue again. Now two or three years may be too quick, but when you've got someone starving to death in prison who you know is not a criminal and you know what he's doing is not a crime, maybe they'll look at it—maybe.

But if not, who cares. In 15, 20 years, they'll say well, he was right. He's dead now, but he was right. I've got to do what I know now is right and I can't let the law, which is often immoral, block me. If Margaret Sanger did that, if Susan B. Anthony did that—look at Martin—look at all these people. I'm not saying I'm like them, but they certainly—I'm certainly going to act like them. I mean, I know this is not a crime. So do you. Everybody with sense does. Your religion may say it's a sin, but that doesn't make it a crime. All these people broke the law and went to jail. I am willing to do the same.

But the Supreme Court has got to decide this on the Ninth Amendment where there is no equivocation, there is no stretching due process. They've got to do that. And if they do and break all these laws down, then we can have a better society, an honest society. I'm willing to risk that. Because at age of 71, I cannot go on living a hypocritical

life when I can't do what I know is right, and the world knows I'm right. Everybody does. Every nation the majority is for what I'm doing. How come it's illegal? That's why I'm doing this.

On March 25, 1999, the third day of trial, defendant rested and gave his closing argument, during which he stated several times that he was acting as his own attorney. The trial court instructed the jury that defendant had a constitutional right to represent himself and that they, the jurors, must not give any negative consideration to defendant's decision to do so.

The following morning, while the jury was deliberating, defendant told the trial court that he would "take your well-advised comments and withdraw in favor of my two attorneys' advice." Gorosh, Dwyer, and defendant's appellate counsel represented him at sentencing. Subsequently, defendant moved for a new trial, alleging that he had been denied the effective assistance of counsel. The trial court denied this motion.

On appeal, defendant asserts that the trial court erred in denying his motion for a new trial because the assistance that Gorosh provided fell below the constitutional standards required for effective assistance of counsel. Defendant also asserts that the trial court erred in denying his motion for a new trial based on the doctrine of "serious mistake of counsel."

### B. STANDARD OF REVIEW AND LEGAL STANDARD

We review a trial court's decision regarding a motion for a new trial for an abuse of discretion.[80] However, with respect to the underlying question

---

[80] *People v Leonard*, 224 Mich App 569, 580; 569 NW2d 663 (1997).

whether Gorosh was ineffective, our review is de novo.[81]

As this Court explained in *People v Knapp*:[82]

> To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, but for defense counsel's errors, there was a reasonable probability that the result of the proceeding would have been different. *People v Stanaway*, 446 Mich 643, 687-688; 521 NW2d 557 (1994). A defendant must affirmatively demonstrate that counsel's performance was objectively unreasonable and so prejudicial as to deprive him of a fair trial. *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994). The defendant must also overcome the presumption that the challenged action might be considered sound trial strategy. *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991), citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

### C. GOROSH'S REPRESENTATION BEFORE MARCH 22, 1999

#### (1) OVERVIEW

Defendant's briefs on appeal contain a litany of complaints aimed at Gorosh. At various places, defendant argues that Gorosh did not provide him with "appropriate advice or advocacy;" that Gorosh was "not qualified" to handle his defense; that Gorosh lacked "personal competence to handle the case;" that Gorosh "completely shut out" Dwyer; that Gorosh "prepared no defense;" that Gorosh "withheld advice during the trial in hope of causing [defendant] to feel helpless and turn over all aspects of the case

---

[81] *People v Toma*, 462 Mich 281, 310; 613 NW2d 694 (2000).

[82] *People v Knapp*, 244 Mich App 361, 385-386; 624 NW2d 227 (2001).

to Gorosh;" that Gorosh "put his own interests ahead of those of his client;" that Gorosh "sat idly by as inappropriate comments were made in the presence of the jury;" that Gorosh "allowed the relationships among co-counsel to deteriorate to such a point that it was impossible for them to provide effective assistance to [defendant];" that Gorosh "allowed his relationship with his client . . . to deteriorate to such a point that it was impossible to provide effective assistance;" that Gorosh "did not maintain adequate communication" with defendant; and that Gorosh's behavior in the courtroom was "totally inappropriate." Indeed, at one point, defendant actually suggests that Gorosh did not allow Dwyer to sit next to defendant at trial "so that she could provide advice." Further, defendant alleges that Gorosh threatened to tell the trial court that Dwyer's pretrial motion to quash the murder count was "ridiculous."[83]

Lost in this corrosive barrage of verbiage is the simple fact that on March 22, 1999, the relationship between defendant and Gorosh changed completely. Before March 22, Gorosh and Dwyer represented defendant as trial counsel; from March 22 through March 25, defendant represented himself with Gorosh and Dwyer serving as standby counsel. With respect to the period before March 22, as nearly as we are able to determine, defendant claims that Gorosh was ineffective because he moved to quash the assisted suicide charge and because he was unqualified and incompetent.

---

[83] Defendant relies on Dwyer's affidavit as support for this allegation. We have reviewed that affidavit and can find no such support.

(2) THE MOTION TO QUASH THE ASSISTED SUICIDE CHARGE

There is no question that Gorosh represented defendant when the defense filed a pretrial motion to dismiss the assisted suicide charge. Had the jury been presented with the assisted suicide charge and decided to convict him of that charge rather then murder, then defendant would have had a prison term no longer than four years and a fine not exceeding $2,000. By removing this charge, the jury was forced to consider convicting him of first-or second-degree murder, both of which carry much stiffer prison terms.[84]

In denying defendant's motion for a new trial regarding this claim, the trial court stated:

> Defendant argues ineffective assistance of counsel due to trial counsel's alleged error in moving to dismiss the assisted suicide charge despite the urgings from co-counsel as well as others, to refrain from making such a motion. Defendant's argument is without merit, evidencing neither harm to Defendant nor a claim for ineffective assistance of counsel. The Court, in fact, denied counsel's motion to dismiss the assisted suicide charge in the Court's Opinion and Order dated March 9, 1999 and further, the People dismissed said charge on their own motion.

We fully agree with the trial court. Even if Gorosh performed deficiently by bringing the motion, defendant cannot demonstrate that doing so caused him any prejudice. The trial court itself protected what defendant now contends was an essential component of his defense by denying the motion. Moreover, on

---

[84] See MCL 750.316 (mandatory life imprisonment for first-degree murder); MCL 750.317 (life in prison or any term of years for second-degree murder).

March 12, 1999, the *prosecutor* declined to proceed on the assisted suicide charge, pursuing only the charges of first-degree murder and delivering a controlled substance. Gorosh had no influence over the prosecutor's decision to take this action. There is no possibility that, but for Gorosh's decision to move to dismiss the assisted suicide charge, the outcome would have been different in this case.

Further, Gorosh's decision to seek dismissal of the assisted suicide charge may have been a matter of trial strategy. During the motion hearing, Gorosh argued for dismissal of the first-degree murder charge and, in the alternative, the assisted suicide charge. Gorosh presented a lengthy and coherent argument that the first-degree murder charge should be dismissed because defendant's conduct fell within the "participation language" in the assisted suicide statute. In the alternative, he explained that if the participation language did not encompass the facts of this case, the assisted suicide charge should be dismissed. Gorosh pursued dismissal of the murder charge, which clearly was a good strategy that would have benefited defendant had it succeeded. The request to dismiss the assisted suicide charge was merely an alternative Gorosh crafted, at least in part, because of the possibility that the trial court would allow the prosecutor to proceed on the murder charge; in fact, Gorosh stated as much during the motion hearing. This Court does not substitute its judgment for counsel's judgment regarding trial strategy.[85] That the strat-

---

[85] See *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

egy Gorosh chose ultimately failed does not constitute ineffective assistance of counsel.[86]

Although defendant relies on Dwyer's affidavit averring that she urged Gorosh not to file the motion, Dwyer herself signed the pleading immediately below Gorosh's signature. Defendant also filed his own motion to dismiss all the charges against him, including the assisted suicide charge. This was, evidently, a strategy to which every member of the defense acceded. Defendant cannot now claim that this strategy denied him his right to effective assistance of counsel. To allow him to do so, to use the well-worn adage, would permit him to "harbor error as an appellate parachute."[87]

### (3) GOROSH'S QUALIFICATIONS AND COMPETENCE

Defendant also claims that Gorosh was not qualified to handle his defense. In making this argument, defendant relies on the affidavits from Dwyer and Michael Schwartz, a former partner at the law firm where Gorosh was employed. According to Schwartz, Gorosh had been practicing for only three years, had limited experience, and had never tried a homicide case. As defendant put it, "Gorosh was running the show, despite his lack of competence to do so alone."

This claim does not warrant a new trial on the basis of ineffective assistance of counsel. Inexperience alone is not enough to conclude that a defense counsel acted deficiently or in a manner that prejudiced the defendant. As the comment following MRPC 1.1 notes:

---

[86] *Id.*

[87] *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000).

A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience . . . . Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

Indeed, Gorosh was, before this trial, associated with a law firm and lawyers who had substantial experience with this defendant and the similar prosecutions instituted against him. Further, defendant never brought any dissatisfaction with Gorosh to the trial court's attention, nor did he seek to end his relationship with Gorosh until after his sentencing. On the first day of trial after defendant indicated that he wished to represent himself, the trial court asked him whether he was dissatisfied with counsel. Defendant stated, "*There's no dissatisfaction.*" In fact, defendant said that he had "planned" to proceed in propria persona "all along." The trial court again asked defendant whether he was dissatisfied with counsel and he responded that he was not, but that there were certain points that he could bring out better than an attorney. Further, during jury deliberations, defendant again chose to have Gorosh represent him during sentencing. Moreover, defendant has failed to demonstrate that, but for Gorosh's alleged deficiencies, the outcome of the trial would have been different.

### D. GOROSH'S REPRESENTATION AFTER MARCH 22, 1999

#### (1) OVERVIEW

Defendant argues that Gorosh's performance during the trial itself was so deficient and prejudicial that it constituted ineffective assistance of counsel, assert-

ing that Gorosh was unprepared, withheld advice, ignored his wishes, "shut out" Dwyer, and was concerned only with his own reputation. Inherent in this argument is the assumption that we should evaluate Gorosh's performance as *standby* counsel in accordance with the same legal standards that we would use in connection with the evaluation of full-blown *trial* counsel. This assumption is unwarranted. However, even if we were to apply the standards in the line of cases following *Pickens* to evaluate Gorosh's performance as standby counsel, we would still conclude that defendant was afforded the representation the constitution guarantees.

## (2) THE RIGHT TO SELF-REPRESENTATION

The United States Constitution,[88] the Michigan Constitution,[89] and MCL 763.1 each guarantee a criminal defendant the right to represent himself.[90] As the United States Supreme Court noted in *Faretta v California*,[91] the right of self-representation is deeply rooted in English legal history:

> In the long history of British criminal jurisprudence, there was only one tribunal that ever adopted a practice of forcing counsel upon an unwilling defendant in a criminal proceeding. The tribunal was the Star Chamber. That curious institution, which flourished in the late 16th and early 17th centuries, was of mixed executive and judicial character, and characteristically departed from common-law tradi-

---

[88] US Const, Am VI.

[89] Const 1963, art 1, § 13.

[90] See *Martinez v Court of Appeal of California, Fourth Appellate Dist*, 528 US 152, 154; 120 S Ct 684; 145 L Ed 2d 597 (2000); *People v Adkins (After Remand)*, 452 Mich 702, 720; 551 NW2d 108 (1996).

[91] *Faretta v California*, 422 US 806, 821-823; 95 S Ct 2525; 45 L Ed 2d 562 (1975).

tions. For those reasons, and because it specialized in try-
ing "political" offenses, the Star Chamber has for centuries
symbolized disregard of basic individual rights. The Star
Chamber Court not merely allowed but required defendants
to have counsel. The defendant's answer to an indictment
was not accepted unless it was signed by counsel. When
counsel refused to sign the answer, for whatever reason,
the defendant was considered to have confessed. Stephen
commented on this procedure: "There is something spe-
cially repugnant to justice in using rules of practice in such
a manner as to debar a prisoner from defending himself,
especially when the professed object of the rules so used is
to provide for his defense." The Star Chamber was swept
away in 1641 by the revolutionary fever of the Long Parlia-
ment. The notion of obligatory counsel disappeared with
it.[92]

In upholding a criminal defendant's right to represent
himself, the Court recognized that there was a tension
between the right to self-representation and the right
to assistance of counsel:

There can be no blinking the fact that the right of an
accused to conduct his own defense seems to cut against
the grain of this Court's decisions holding that the Constitu-
tion requires that no accused can be convicted and impris-
oned unless he has been accorded the right to the assis-
tance of counsel. For it is surely true that the basic thesis
of those decisions is that the help of a lawyer is essential to
assure the defendant a fair trial. And a strong argument can
surely be made that the whole thrust of those decisions
must inevitably lead to the conclusion that a State may con-
stitutionally impose a lawyer upon even an unwilling
defendant.

But it is one thing to hold that every defendant, rich or
poor, has the right to the assistance of counsel, and quite
another to say that a State may compel a defendant to
accept a lawyer he does not want. The value of state-

---

[92] Citation omitted.

appointed counsel was not unappreciated by the Founders, yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice.[93]

Here, defendant made a free choice to represent himself. He clearly and unequivocally waived his right to counsel. Indeed, defendant does not claim that he somehow retained his right to counsel at trial or that the trial court failed to comply with the necessary requirements regarding a proper waiver. As the Court also noted in *Faretta*, a defendant who exercises the free choice to represent himself faces certain consequences:

> The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."[94]

Therefore, defendant cannot now suggest that his free choice to represent himself, standing alone, denied him effective assistance of counsel. As the trial court accurately put it, defendant cannot use his waiver of trial counsel as both a sword and a shield in order to achieve the outcome he desires.

### (3) "HYBRID" REPRESENTATION

Defendant suggests, however, that he actually proceeded with a type of "hybrid" representation. This

---

[93] *Id.* at 832-834 (citations omitted).
[94] *Id.* at 835, n 46.

argument is wholly unconvincing. In denying defendant's motion for a new trial, the trial court stated that it had *denied* defendant's request to proceed with a hybrid defense. In his brief, defendant even acknowledges that the trial court denied this request. Further, contrary to defendant's suggestion, there is no constitutional right to a hybrid defense and, thus, a trial court is not required to order hybrid representation.[95]

Defendant, however, argues that "hybrid representation can be and has been allowed in appropriate situations." In support of this assertion, he cites two Michigan cases, *People v Ramsey*[96] and *People v Griffen*.[97] In *Ramsey*, this Court cited *Faretta* for the proposition that " 'standby counsel' may be appropriate to assist a defendant who represents himself."[98] Again referring to *Faretta*, as well as Chief Justice Burger's concurrence in *Mayberry v Pennsylvania*,[99] this Court went on to say that "these cases do not stand for the proposition that a defendant has a right to share trial defense responsibilities with an attorney."[100] Only in a footnote did this Court suggest that hybrid representation *"might* be appropriate in some cases[.]"[101] Even then, this Court still noted that "the administrative difficulties inherent in such a scheme

---

[95] See *McKaskle v Wiggins*, 465 US 168, 183; 104 S Ct 944; 79 L Ed 2d 122 (1984).

[96] *People v Ramsey*, 89 Mich App 260; 280 NW2d 840 (1979).

[97] *People v Griffen*, 36 Mich App 368; 194 NW2d 104 (1971), overruled on other grounds in *People v Reed*, 393 Mich 342, 351; 224 NW2d 867 (1975).

[98] *Ramsey, supra* at 263.

[99] *Mayberry v Pennsylvania*, 400 US 455, 467-468; 91 S Ct 499; 27 L Ed 2d 532 (1971).

[100] *Ramsey, supra* at 263.

[101] *Id.* at 263, n 1 (emphasis added).

are apparent."[102] Though making this vague and definitely hedged statement, this Court in *Ramsey* still affirmed the trial court's decision to deny the defendant a form of hybrid representation. This dictum in *Ramsey* provides no basis for us to conclude that the trial court erred here in denying defendant's request for hybrid representation.

The very short discussion of representation in *Griffen* provides no more support for defendant's argument. In *Griffen*, the

> [d]efendant requested that his assigned counsel be dismissed. This request was granted but at the judge's request, counsel remained to help defendant, if needed. Counsel conducted the *voir dire* examination of the jury and cross-examined some witnesses. Defendant's claim of reversible error because he was denied his right to proceed *in propria persona* is not sustained on this record.[103]

Thus, *Griffen* stands for the negative proposition that allowing hybrid representation does not compromise a defendant's right to proceed in propria persona. It certainly does not stand for the affirmative proposition that a failure to allow hybrid representation constitutes error requiring reversal.

Defendant fares no better in citing federal precedent. He refers us to *United States v Hill*[104] and to *United States v Tutino*.[105] In *Hill*, the United States Court of Appeals for the Tenth Circuit interpreted numerous federal opinions as "not foreclos[ing] a trial judge from allowing hybrid representation in appropriate cases; rather, they indicate *no right to hybrid*

---

[102] *Id.*

[103] *Griffen, supra* at 372.

[104] *United States v Hill*, 526 F2d 1019 (CA 10, 1975).

[105] *United States v Tutino*, 883 F2d 1125, 1141 (CA 2, 1989).

*representation exists.*"[106] In *Tutino*, the court wrote
that "[t]he decision to grant or deny 'hybrid represen-
tation' lies solely within the discretion of the trial
court." *Tutino*, which explicitly noted "that a criminal
defendant has no constitutional or statutory right to
represent himself as co-counsel with his own attor-
ney," plainly did not reach the holding defendant
wishes us to reach in this case.[107] Whatever "appropri-
ate" circumstances might explain a trial court's deci-
sion to allow a defendant to proceed with hybrid rep-
resentation, defendant has failed to demonstrate that
they existed here.

(4) STANDBY COUNSEL

Defendant also claims that he was denied the effec-
tive assistance of counsel when Gorosh functioned as
standby counsel. A defendant who asserts his right to
self-representation has no absolute entitlement to
standby counsel.[108] As the Michigan Supreme Court
explained in *People v Dennany*,[109] "[A] defendant has
a constitutional entitlement to represent himself or to
be represented by counsel—but not both." Conse-
quently, the Court held in *Dennany* that Const 1963,
art 1, § 13 "permits the use of standby counsel as a
matter of grace, but not as a matter of right."[110]

The defendant in *McKaskle v Wiggins*[111] placed the
proper role of standby counsel squarely in front of
the United States Supreme Court. In *McKaskle*, defen-

---

[106] *Hill, supra* at 1024 (emphasis added).

[107] *Tutino, supra* at 1141.

[108] See *People v Davis*, 216 Mich App 47, 55-56; 549 NW2d 1 (1996).

[109] See *People v Dennany*, 445 Mich 412, 442; 519 NW2d 128 (1994).

[110] *Id.* at 443.

[111] *McKaskle, supra.*

dant Carl Wiggins vacillated between asserting his right to represent himself and his right to assistance of counsel at both of his trials.[112] On appeal, Wiggins claimed that his standby counsel impinged on his right to present his own defense, as *Faretta* guaranteed.[113] As Justice O'Connor put it, Wiggins contended that his right to represent himself "was impaired by the distracting, intrusive, and unsolicited participation of counsel throughout the trial."[114]

The Court agreed with Wiggins' underlying premise that a defendant who represents himself "must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial."[115] However, the Court concluded that Wiggins had been "accorded all of these rights."[116] Further, the Court noted that the right to self-representation "must impose some limits on the extent of standby counsel's unsolicited participation."[117] Consequently, the Court held that a defendant who represents himself "is entitled to preserve actual control over the case he chooses to present to the jury" and that "participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself."[118]

---

[112] *Id.* at 170-173.
[113] *Id.* at 173.
[114] *Id.* at 176.
[115] *Id.* at 174.
[116] *Id.*
[117] *Id.* at 177.
[118] *Id.* at 178.

Applying its holding to the facts of the case, the Court noted that the performance of Wiggins' standby counsel "should not serve as a model for future trials," but the Court nevertheless determined that standby counsel's participation at trial "fell short of infringing on Wiggins' [*Faretta*] rights."[119] In essence, the Court held that while the standby counsel may have been rather assertive and somewhat obnoxious, he did not do *too much.*

Here, defendant asserts the opposite. He claims that Gorosh did *too little.* Defendant placed himself in the unenviable position of suggesting that, in light of his own inadequacies in representing himself at trial, Gorosh should have done *more* to help him. *McKaskle* stands for the proposition that a defendant who represents himself is entitled to maintain actual control over the case, which standby counsel cannot destroy by altering the jury's perception that the defendant is representing himself. In other words, "the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised."[120] Conceptually, it is difficult to conceive of a situation in which a reticent, rather than an assertive, standby counsel could wander into either of these two protected areas. In the absence of a right to standby counsel or even a right to hybrid representation, *McKaskle* provides an intellectual foundation for the proposition that a defendant who chooses to represent himself does so at his own peril. With no constitutional right to an attorney, a defendant proceeding in propria persona has no basis to claim that the attorney must abide by constitutional standards.

---

[119] *Id.* at 186.

[120] *Id.* at 179.

Two federal opinions support this view. In *United States v Schmidt*,[121] the defendant claimed that the attorney appointed to serve as standby counsel at trial was "so deficient and prejudicial to her that it constituted ineffective assistance of counsel."[122] This was a mirror image of the argument in *McKaskle*; the defendant in *Schmidt* asserted that her attorney did *too little* rather than *too much*. The *Schmidt* court rejected this argument for three reasons. First, the defendant had waived her right to counsel when she asserted her right to represent herself.[123] Second, the defendant did not have the right to hybrid counsel.[124] Rather, "[a]bsent a constitutional right to standby counsel, a defendant generally cannot prove standby counsel was ineffective."[125] As the court remarked:

> As might be expected, a standby counsel's duties are considerably more limited than the obligations of retained or appointed counsel. . . . Although [the defendant's standby counsel's] role expanded as the case continued, he did not play the same role that defense counsel normally would in preparing the strategy for a criminal defense. Perhaps in a case where standby counsel held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings, we would consider a claim of ineffective assistance of standby counsel. *This is not such case. Because* [the defendant] *proceeded pro se, she may not now assign blame for her conviction to standby counsel.*[126]

---

[121] *United States v Schmidt*, 105 F3d 82 (CA 2, 1997).

[122] *Id.* at 89.

[123] *Id.* at 90.

[124] *Id.*, citing *United States v Cochrane*, 985 F2d 1027, 1029 & n 1 (CA 9, 1993), and *United States v Windsor*, 981 F2d 943, 947 (CA 7, 1992).

[125] *Schmidt, supra* at 90.

[126] *Id.* (emphasis added).

Third, the court concluded that even if the traditional test for evaluating ineffective assistance of counsel claims was applied, the defendant's standby attorney passed the constitutional threshold for performance and there was no evidence of prejudice.[127]

The more recent decision in *United States v Morrison*[128] interpreted *Schmidt*:

> As we held in *Schmidt*, without a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel. While we stated in *Schmidt* that we might entertain a claim for ineffective assistance of standby counsel if standby counsel "held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings," the record indicates that Morrison retained control of his own defense throughout the proceedings, so that his standby counsel was in reality, as well as in name, only that.

Going one small step beyond *Schmidt*, the court in *Morrison* concluded that this rule of law did not require the additional, and therefore superfluous, process of determining whether standby counsel was effective.

We find this reasoning in *Schmidt* and *Morrison* persuasive. From March 22 through March 25, defendant represented himself. During this time, Gorosh was his standby counsel in reality as well as in name. Because defendant chose to represent himself during this period, he may not now assign blame for his conviction to Gorosh. Further, Gorosh did nothing to interfere with defendant's right to control the case or to alter the jury's perception that defendant was rep-

---

[127] *Id.* at 90-91.

[128] *United States v Morrison*, 153 F3d 34, 55 (CA 2, 1998) (citations omitted).

resenting himself. In short, during this period, Gorosh was not acting as counsel within the meaning of the Sixth Amendment or Const 1963, art 1, § 13 and, therefore, cannot be held to the standards of effective assistance required of trial counsel. In any event, Gorosh's performance as standby counsel did not fall below an objective standard of reasonableness and defendant has made no showing that, but for Gorosh's alleged errors, the result of the proceedings would have been different.

### E. THE "SERIOUS MISTAKE" DOCTRINE

Defendant claims that he is entitled to a new trial under the common-law "serious mistake" standard for evaluating ineffective assistance of counsel claims. Substantively, he claims that Gorosh's failures, described in his traditional ineffective assistance of counsel argument, also constituted a violation of this serious mistake doctrine. The cases defendant cites[129] as announcing this serious mistake doctrine rely on *People v Garcia*.[130] In *Garcia*,[131] the Michigan Supreme Court relied on the statement in *People v Degraffenreid*[132] that

> "[a] claim that an adequate lawyer made a serious mistake does not raise the constitutional issue of the right to counsel; it does not involve the concept of 'effective assistance of counsel,' it should not be measured against the sham trial standard which circumscribes the constitutional right."

---

[129] See *People v Sealy*, 136 Mich App 168, 175-176; 356 NW2d 614 (1984), *People v Smith*, 108 Mich App 338, 343; 310 NW2d 235 (1981), and *People v Lotter*, 103 Mich App 386, 389; 302 NW2d 879 (1981).

[130] *People v Garcia*, 398 Mich 250, 266; 247 NW2d 547 (1976).

[131] *Id.*

[132] *People v Degraffenreid*, 19 Mich App 702, 717; 173 NW2d 317 (1969).

Thus, the Court in *Garcia* held that

> even where assistance of counsel satisfies the constitutional
> requirements, defendant is still entitled to a fair trial. Defen-
> dant can be denied this right if his attorney makes a serious
> mistake. But a court should not grant a new trial unless it
> finds that but for this mistake defendant would have had a
> reasonably likely chance of acquittal.[133]

Subsequently, the United States Supreme Court set
forth the federal standard for determining whether a
defendant received the effective assistance of counsel
in *Strickland, supra,* which the Michigan Supreme
Court adopted in *Pickens.*[134] Having moved away from
the "sham trial" test previously used to analyze effec-
tive assistance of counsel claims, which was the basis
for the comment in *Degraffenreid* regarding an attor-
ney's serious mistake,[135] the *Pickens* Court reexam-
ined *Garcia:*

> Our Court of Appeals . . . has interpreted this Court's
> decision in *Garcia* as requiring the reversal of a conviction
> even if defense counsel's ineffective assistance did not
> prejudice the defendant. While we recognize that the opin-
> ion is less than a model of clarity and might be so inter-
> preted, such a procedure is not mandated by federal law.
> *Garcia* essentially relied on Sixth and Fourteenth Amend-
> ment jurisprudence, and did not formulate the standard
> from the intentions, history, or common law undergirding
> the Michigan Constitution. *Garcia,* therefore, does not
> stand for the proposition that the Michigan Constitution
> was intended to grant stronger protections than federal
> authority with regard to the standards applied to the issue
> of ineffective assistance of counsel.[136]

---

[133] *Garcia, supra* at 266.

[134] *Pickens, supra* at 326-327.

[135] *Degraffenreid, supra* at 717.

[136] *Pickens, supra* at 312-313.

Thus, in *Pickens*, the Michigan Supreme Court put to rest any notion that there is an alternative, common-law test for effective assistance of counsel. Again, defendant has failed to provide any persuasive authority to disprove this clear decision in *Pickens*, which excuses us from engaging in an exhaustive search of our own.[137] As the First Circuit Court of Appeals so aptly put it, "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."[138] Moreover, even if there were such a standard for an attorney's conduct, the same flaws in defendant's reasoning concerning Gorosh's performance apply in this context, especially because he wholly relies on his arguments concerning ineffective assistance to outline what he considers serious mistakes. Thus, there is no merit to this issue.

## V. DEFENDANT'S CLOSING STATEMENT

### A. FACTS AND ARGUMENT

Defendant gave his own closing argument to the jury on March 25, 1999. Although he did not testify at the trial, at several points in his closing argument defendant injected what would appear to be first-person testimony:

> [*Defendant*]: Next time he [the prosecutor] uses the word "kill" or "murder" please ask yourselves, please—why? Did you ever ask him why I did that, why I did this act he calls killing? He says just to murder Thomas Youk that's all, to

---

[137] See *Mitcham, supra*.

[138] *United States v Zannino*, 895 F2d 1, 17 (CA 1, 1990).

kill him . . . . Next time he [sic] you hear him utter kill, say why, and when.

Why then? Why on the 17th of September? Why not a month earlier or three years earlier? Ask him why not earlier didn't he call me to kill him. Those are unanswerable questions. He can't answer those. Why did Tom Youk call name [sic] on the 15th of [sic] 16th? Why did he call me? Because he had—

[*The Prosecutor*]: Well, objection, Judge. He can't testify now. He can't tell the facts now. That portion's over.

*The Court*: You have something in evidence. We don't know whether he's going to talk about what's in evidence.

\* \* \*

[*The Defendant*]: I staged the whole thing. Really. I'm not much of a producer or a director in movies. We—I wanted to protect the family from possible charges—

[*The Prosecutor*]: Objection, objection. Again, he's testifying. He can't put facts into—

[*The Defendant*]: I'm trying to show why I did it.

\* \* \*

[*The Prosecutor*]: He cannot put facts before the jury which might not have been proven before or through testimony or other evidence. He cannot testify now.

\* \* \*

[*The Defendant*]: There were no witnesses there. Now can I say why?

[*The Prosecutor*]: I'm objecting.

*The Court*: Well, sir, it depends on how you phrase it.

[*The Defendant*]: There were no witnesses there because I didn't want anyone else—

[*The Prosecutor*]: Objection.

[*The Defendant*]:—implicated.

[*The Prosecutor*]: Objection.

[*The Defendant*]: Well, that's—can I say why?

[*The Prosecutor*]: Judge, you know, he could have gotten on—you know, he didn't—

*    *    *

[*The Prosecutor*]:—He didn't—he can't testify now. He cannot testify now.

[*The Defendant*]: Why—why I took so much time with the needle down here. Can I say that?

*The Court*: You can comment about what is in evidence. You can comment about what is on the tape.

[*The Defendant*]: I took my time down here in this one vein, trying to get a small vein, trying to keep—

[*The Prosecutor*]: Your Honor, I'm going to object again. He's now testifying. He's putting new facts before the jury. He can't do that.

[*The Defendant*]: Okay. The covering up of the needle sticks was to try to keep this—

[*The Prosecutor*]: Objection.

[*The Defendant*]: Well, you talked about the needle sticks.

[*The Prosecutor*]: You can't say—Judge, he's giving reasons for these things. That has to come through testimony. It can't be presented through his closing argument to the jury.

*The Court*: You may make argument about what they saw, but you can't introduce something new. Okay?

[*The Defendant*]: After they saw the slip of paper on the floor with my name on it, this became known. It became known. Why didn't I come forward immediately after I did it? It became known only after they discovered my name on it and then I know—everyone knew it would become known. It wasn't done for staging, it wasn't done to show. It wasn't videotaped for that purpose. And why was a narration, which he brings up? Can I give reasons for the narration?

[*The Prosecutor*]: I object.

*    *    *

[*The Defendant*]: That's the implication given by the prosecutors and other—other antagonists, implying that it's very cursory, that I don't really know these patients, I don't know anything about them. No doctor who's got integrity and is competent would proceed without definitive medical

information on the patient. The only point is they don't have that information. I do.

[*The Prosecutor*]: Well, objection. The jury doesn't have that, either. Again, I'm going to object to him putting in facts that didn't come in during trial.

*The Court*: Let's see if we can break this down. You may comment about anything that's in evidence. You may not comment about anything he said. You just can't introduce something.

The next day, while the jury was deliberating, defendant moved for a mistrial on the basis of the prosecutor's comments. The trial court denied the motion.

Defendant now contends that the prosecutor, while objecting to his closing arguments, several times improperly referred to defendant's decision to exercise his right to remain silent. Although defendant later moved for a mistrial, he failed to object to the prosecutor's comments at the time the prosecutor made them. According to Gorosh, this was a calculated decision not "to disrupt the flow of closing" and an effort "to get a copy of the transcript" of the prosecutor's comments to be used for the motion for a mistrial.

### B. PRESERVATION AND STANDARD OF REVIEW

Defendant failed to preserve this issue for appeal by objecting to the prosecutor's allegedly improper comments in a timely fashion.[139] Accordingly, our review is limited to determining whether the comments were plain error that affected defendant's substantial rights.[140]

---

[139] See *People v Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000).

[140] See *People v Carines*, 460 Mich 750, 761-762; 597 NW2d 130 (1999).

### C. RIGHT NOT TO TESTIFY

Neither a prosecutor nor a trial court may comment on a defendant's decision to exercise his constitutional right not to testify.[141] Published state precedent does not address the precise situation presented in this case. The cases that defendant cites are distinguishable because they do not involve a defendant who proceeded in propria persona. However, *People v Marcus Jones*[142] is instructive.

In *Marcus Jones*, while the prosecutor was giving his closing argument to the jury, the prosecutor described a piece of trial testimony, prompting the defendant to interject, " 'They didn't say that.' "[143] The trial court admonished the defendant, stating, " 'If you want to testify, sir, your chance to do that is over with you [sic]. You can't sit there—listen Mister—you had an opportunity to testify. You can't testify now.' "[144] Defense counsel then objected, prompting the trial court to ask: " 'Objection to what? He's out now speaking, [defense counsel] [sic]. He had that opportunity. The jury knows that. He can't have it both ways, sir.' "[145]

Though this Court reversed the defendant's conviction in an unpublished opinion per curiam, issued July 10, 1992 (Docket No. 127207), the Michigan Supreme Court, in lieu of granting leave to appeal, peremptorily vacated the judgment of this Court and remanded the matter to this Court for reconsidera-

---

[141] See *Griffin v California*, 380 US 609, 615; 85 S Ct 1229; 14 L Ed 2d 106 (1965); *People v Fields*, 450 Mich 94, 108-109; 538 NW2d 356 (1995).

[142] *People v Marcus Jones*, 442 Mich 893; 499 NW2d 344 (1993).

[143] *Id.* at 893.

[144] *Id.*

[145] *Id.* at 894.

tion.[146] After acknowledging that "neither the prosecutor nor the trial court may comment on the defendant's exercise of his constitutional right not to testify," the Supreme Court nevertheless concluded that the trial court's remarks were a proper response to the defendant's interruption. Further, the Court noted, "[t]hough awkwardly phrased, the judge's statements were consistent with his obligation to maintain orderly proceedings and proper decorum in the courtroom."[147] Finally, the Court concluded that the defendant was not entitled to a new trial, having not been denied a fair trial in the first instance.[148]

The Mississippi Supreme Court reached a similar conclusion in *Larry Jones v State*.[149] The defendant in *Larry Jones* did not testify during trial, but chose to argue the sentencing phase of his capital murder prosecution.[150] During his argument, the defendant referred to facts that were not in evidence.[151] Consequently, the prosecutor objected in the presence of the jury:

> That's testifying and there's no way to contradict that and it's not fair, Judge, if he doesn't take the stand and let the State cross examine him on this but to stand up here and to be able to do something that the State does not have a right to cross examine him on is not proper . . . . The State didn't have a right to call him, Judge. We couldn't put him on the stand.[152]

---

[146] *Id.* at 893.

[147] *Id.*

[148] *Id.*

[149] *Larry Jones v State*, 381 So 2d 983 (Miss, 1980).

[150] See *id.* at 993.

[151] *Id.* at 997.

[152] *Id.* at 998.

The Mississippi Supreme Court acknowledged that defendants must make a difficult choice between arguing their own case and invoking the right not to testify.[153] However, the court remarked that

> [a] criminal defendant who takes advantage of his right to argue his case to the jury must not be permitted to say all the things he might have testified to had he chosen to call himself as a witness. When he does so, he will be deemed to have waived the right not to have his failure to take the stand commented upon.[154]

Though the court noted that a defendant representing himself still had to follow the court rules, it nevertheless indicated that trial courts should give these defendants some "leeway" in arguing their case.[155] However, the court cautioned:

> [I]n those instances where a defendant, arguing *pro se*, clearly goes beyond the evidence in the record on a material point, as he did in this case, he must accept as a consequence the prosecution's comment on his failure to swear to the testimony. The defendant's remarks in this case cannot be dismissed as a failure to grasp "legal niceties." They are unsworn testimony, and as such, constitute a partial waiver of the constitutional privilege against self-incrimination and the prohibition against a district attorney from commenting on his not taking the stand.
>
> We do not say that every defendant who argues *pro se* loses the privilege against prosecutorial comment on his failure to testify. Only when the defendant's remarks go beyond the evidence does he waive this privilege.[156]

---

[153] *Id.* at 993.

[154] *Id.*

[155] *Id.* at 993-994.

[156] *Id.* at 994.

Thus, as did the Michigan Supreme Court in *Marcus Jones*, the Mississippi Supreme Court in *Larry Jones* concluded that there was no error requiring reversal because the "defendant's own statements which were exculpatory and self-serving in nature, not under oath and not supported by the record," prompted the prosecutor to make the comment at issue.[157]

The Missouri Supreme Court used a variation of this "proper response" rationale in *State v Brannson*[158] to reject the defendant's contention that the prosecutor's objections and remarks improperly referred to his decision not to testify though proceeding in propria persona. Describing the context in which the references to the defendant's decision not to testify arose, the *Brannson* court explained:

> This is not a case in which a defendant sits mute at counsel table and the prosecution points up the defendant's failure to testify. On the contrary, this is a case in which defendant undertook his own defense and during his protracted trial participation effectively injected himself into the mainstream of the evidence. He attempted not only to argue the various points in issue but in the presentation of evidence through his lengthy interrogation of the State's witnesses, sought repeatedly to state as facts items not otherwise in evidence and in certain instances to establish as fact matters of which the witnesses had no knowledge. Clearly these were points which defendant considered vital to his case and on which he was apparently otherwise unable or unwilling to obtain proof. In effect he was attempting in that manner to testify to these otherwise unproved "facts." The objections of the prosecutor to those attempts of defendant, some of which were successful, some not, accurately pointed out what defendant was trying to do—and lodged the objections in those terms (*e.g.*, defendant "is

---

[157] *Id.* at 993.
[158] *State v Brannson*, 679 SW2d 246 (Mo, 1984).

attempting to testify to that." "He's trying to testify." "Defendant is again trying to testify."). The objections went to the form of the questions and in several instances were sustained. . . . [T]his is not a case in which defendant failed or refused to testify and in which comment was made on that fact. Indeed it is the opposite. Defendant sought in the jury's presence to state as evidence matters not in proof and in so doing he sought to testify without having been sworn and the prosecutor objected for that reason in those terms.[159]

The *Brannson* court then described a rule that was easy to apply:

The orthodox standard prohibiting comment by the prosecution on the failure of the accused to testify is applicable when the accused is silent, but when the accused conducts his own defense and attempts—innocently or otherwise—to testify or to inject facts not in evidence into the case, a different problem arises. For then it is defendant's "attempt to testify" to which objection is made.[160]

In the absence of a "direct and unequivocal" reference to the defendant's right not to testify, the court held that there was no error requiring reversal.

Here, the prosecutor's objection to defendant's failure to testify fits squarely within the reasoning of both *Jones* cases and *Brannson*. Defendant's decision to testify to the jury during closing arguments rather than commenting on the evidence admitted at trial prompted the prosecutor's response. Defendant's comments can only be characterized as repeated and improper attempts to present the jury with facts not in evidence. The prosecutor's comments were properly focused on preventing defendant from continuing

---

[159] *Id.* at 249 (citations omitted).
[160] *Id.* at 250.

down this wrong path. The prosecutor's comments certainly were not the sort of "direct and unequivocal" reference the court in *Brannson* would have found plain error requiring reversal. To defendant's benefit, the trial court also instructed the jury that every defendant has an absolute right not to testify, that the jurors must not consider the fact that defendant did not testify, and that this fact must not affect their verdict in any way. In sum, given the circumstances of this case, we conclude that defendant has failed to demonstrate a plain error requiring reversal. We note that our conclusion does not hinge, as did the Mississippi Supreme Court's decision in *Larry Jones*, on the notion that the defendant partially waived his constitutional privilege against self-incrimination when his remarks went beyond the evidence. We simply conclude that the prosecutor's objections and comments did not constitute direct and unequivocal references to defendant's failure to testify. Rather, they merely amounted to objections to defendant's repeated and improper attempts to inject facts not in evidence into his closing statement.

VI. TESTIMONY OF TERRENCE AND MELODY YOUK

A. FACTS AND ARGUMENT

Before trial, the prosecutor moved to preclude defendant from asserting the defenses of consent and euthanasia and from introducing any irrelevant testimony regarding Youk's medical condition, pain and suffering, and quality of life and to prevent a jury nullification argument. In its opinion and order, the trial court granted the prosecutor's motions, but allowed evidence of Youk's pain and suffering and quality of

life where such evidence related to the assisted suicide charge that was still pending at that time. When the prosecutor decided not to pursue the assisted suicide charge, defendant asked the trial court to reconsider its decision to exclude evidence of Youk's pain and suffering, among other things. The trial court denied this motion.

When defendant submitted his witness list, however, it included Melody and Terrence Youk. The trial court instructed defendant that he needed to make an offer of proof concerning the two witnesses. On the second day of trial, defendant made an offer of proof indicating that Terrence Youk would testify that defendant did not intend to murder Thomas Youk. With regard to Melody Youk, defendant indicated that her testimony was relevant to Thomas Youk's background and his own intent.

The trial court made a special record regarding defendant's offer of proof. Melody Youk testified that when she met with defendant, she explained Youk's condition and she indicated that they understood that defendant may be able to "assist [them] in relieving his pain and suffering." According to Melody Youk, in a subsequent conversation, she, Terrence Youk, and defendant discussed what defendant could do "to bring an end to this situation."

Defendant argued that Melody Youk's testimony was relevant to establish Thomas Youk's state of mind and defendant's perception. In response, the prosecutor argued that Melody Youk's testimony related to consent and euthanasia, which were not recognized defenses to murder, and that Melody Youk's testimony did not concern defendant's state of mind. The trial court then allowed defendant to question Melody Youk further. She testified that she never told defen-

dant that her intent was to have defendant kill Youk and that they never discussed the words "kill or murder." Defendant again argued that Melody Youk's testimony was relevant to show that he did not intend to kill Youk.

Following arguments of the parties, the trial court ruled that Melody Youk's testimony was not appropriate. The trial court stated that defendant was attempting to introduce evidence of a mercy killing, which is not cognizable under state laws, and that his proffered evidence related to the law and a legal argument or debate, which do not go before a jury. The trial court also stated that the fact that Melody Youk did not want defendant to "do something" was not relevant to defendant's state of mind. The trial court reiterated that any consent to defendant's action was irrelevant.

With regard to Terrence Youk's testimony, defendant argued that he had a constitutional right to kill a patient. The trial court ultimately ruled that Terrence Youk's proposed testimony was hearsay and irrelevant. The issue was again raised during defendant's motion for bond pending appeal and the trial court again ruled that the offer of proofs indicated that the witnesses would only testify concerning euthanasia and consent, which were not legally cognizable defenses.

Defendant now argues that the trial court erred in barring him from calling Terrence and Melody Youk to testify at trial. Defendant contends that Terrence and Melody Youk were res gestae witnesses because they were listed on the police report and were familiar with certain circumstances surrounding Youk's death. Further, defendant asserts, Terrence and Melody Youk could have testified about Youk's death, the

effect of his disease, his daily life conditions, and his consent, as well as rebutting the prosecutor's argument that defendant's purpose was to seek publicity and to advance his own agenda.

### B. STANDARD OF REVIEW

The trial court has discretion when considering whether to admit evidence.[161] Thus, we review the trial court's decision to exclude this evidence for an abuse of that discretion.[162]

### C. RES GESTAE WITNESSES

Defendant states that because Terrence and Melody Youk were res gestae witnesses, "the Prosecutor himself was obligated to call [them] to the stand." In making this claim, defendant apparently relies on MCL 767.40a[163] as it appeared before the Legislature amended it in 1986,[164] as well as the cases interpreting that former version of the statute. However, under the current version of the statute, the prosecutor no longer has a duty to produce res gestae witnesses.[165] Instead, the prosecutor has a continuing duty to advise the defense of all res gestae witnesses that the prosecution intends to produce at trial.[166] "Put in other terms, the prosecutor's duty to produce res gestae witnesses was replaced with the duty to provide notice of known witnesses and to give reasonable assistance in the locating of witnesses if a defendant

---

[161] *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998).

[162] *Id.*

[163] 1941 PA 336.

[164] 1986 PA 46.

[165] See *People v Burwick*, 450 Mich 281, 298; 537 NW2d 813 (1995).

[166] See *People v Snider*, 239 Mich App 393, 423; 608 NW2d 502 (2000).

requests such assistance."[167] Thus, even if Terrence and Melody Youk could be considered res gestae witnesses, the prosecutor had no duty to produce them to testify.

### D. RELEVANCE

We have a separate, and further, rationale for affirming the trial court's decision to exclude this evidence. As the trial court noted repeatedly, the two witnesses simply had no relevant testimony to offer to the jury. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is *of consequence to the determination of the action* more probable or less probable than it would be without the evidence."[168] A variety of factors, including the elements of the charged crimes, the theories of admissibility, and the defenses asserted all help determine whether any particular piece of evidence is relevant.[169]

The testimony Terrence and Melody Youk would have provided to the jury concerned Youk's medical condition, pain, suffering, and the conditions of his daily life, as well as his consent. By proffering such evidence, defendant sought to justify killing Youk. In fact, although defendant claims that he proffered their testimony for other reasons, the crux of his claims consistently relate to consent and euthanasia. Simply put, consent and euthanasia are not recognized defenses to murder. As the trial court noted, "[a] trial court may exclude from the jury testimony

---

[167] *Id.*

[168] MRE 401.

[169] *People v Brooks*, 453 Mich 511, 517-518; 557 NW2d 106 (1996), quoting *People v Mills*, 450 Mich 61, 67-68; 537 NW2d 909 (1995).

concerning a defense that has not been recognized by the Legislature as a defense to the charged crime."[170] Thus, Terrence and Melody Youk's testimony was inconsequential to the determination of this case.

Within this issue, defendant also suggests that he was prejudiced because the prosecutor discussed "lack of consent" and defendant's political and personal agenda. Defendant asserts that the testimony of Terrence and Melody Youk could have contradicted those claims. This argument is entirely unpersuasive. The trial court allowed defendant to argue that Youk consented to defendant's actions. Further, the jury saw the videotape of Youk consenting to defendant's actions. Similarly, defendant himself stated on the videotape and during his closing argument to the jury that his motive in killing Youk was to relieve Youk's pain and suffering and to bring the issue of euthanasia to the forefront. Accordingly, we conclude that the trial court did not abuse its discretion in precluding Terrence and Melody Youk from testifying.

Affirmed.

---

[170] *People v Demers*, 195 Mich App 205, 207; 489 NW2d 173 (1992).