# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRYAN PRESTON FARMER,

Defendant-Appellant.

UNPUBLISHED
May 26, 2015

No. 320076
Ingham Circuit Court
LC No. 12-000625-FC

Before: WILDER, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct (personal injury), MCL 750.520b(1)(f), unlawful imprisonment, MCL 750.349b, and assault with a dangerous weapon, MCL 750.82. The trial court sentenced defendant, as a fourth habitual offender, MCL 769.12, to 75 to 100 years in prison for the criminal sexual conduct convictions, 19 to 50 years in prison for the unlawful imprisonment conviction, and 5 to 15 years in prison for the felonious assault conviction. We affirm.

I

Defendant's convictions arise out of his March 20, 2012 rape, unlawful imprisonment, and assault of Marla Lade, who is a mentally disabled adult with an IQ between 62 and 70. Marla lives independently on social security disability funds and volunteers her time with child care, with her church, and at her apartment complex.

Years before the March 20 incident, Marla formed a relationship with defendant's mother, Betty Canty, and defendant's sister, Monique Farmer. According to several witnesses, defendant's family was controlling of Marla, enjoying her cleaning and babysitting services without compensating her and convincing her to give them money and food stamps.

Defendant was in prison until August 2011. Though defendant was imprisoned as a sex offender, Marla testified that she was under the impression that he had been in prison for writing bad checks and she thought that he was rehabilitated. Sometime after Christmas 2011, Marla had visited defendant and stayed the night at his house on one occasion when he was sick to his stomach; she cared for him, cleaned, and slept on the couch. Marla testified that defendant did nothing to make her feel uncomfortable on that occasion. However, subsequent to this occasion, defendant called Marla several times and repeatedly asked her to come over; she testified that

she thought that he wanted to talk. Marla testified that, when she arrived at his house, defendant told Marla that he needed sex to calm down. Marla recalled that defendant penetrated her vagina with his penis and touched her breasts; she told defendant repeatedly that he was hurting her legs, but he responded that she should calm down and it would not hurt. Afterwards, Marla slept on the living room couch and defendant slept in the bedroom. Marla testified that she did not report what had happened because she did not think it would happen again.

On March 20, 2012, defendant called Marla to tell her he wanted to repay a $40 debt he owed her. Because defendant's parole officer had not approved Marla's home for visits, they arranged to meet across the street from her apartment at the coin laundry. When they met, defendant did not actually have the money but promised to get it if Marla accompanied him in his car. Marla testified that defendant eventually took her to his house, where Marla told defendant she preferred to stay in the car; she did not want to have sex; she just wanted her money. At defendant's insistence, however, Marla went inside and when she walked in the door, defendant pushed her, said she was not going home that night, and slapped her on the cheek.

Marla testified that defendant took her to the bedroom and undressed her, tied a rope around her neck, and handcuffed her. Marla recalled that defendant had a "gray" knife with a black handle[1] that he held to her cheek, and threatened to continue to keep the knife at her throat if she didn't do what he told her to do. Marla testified that defendant gave her approximately three Vicodin pills and made her swallow them with alcohol, and afterwards, she felt "woozie." Marla recalled that, at some point, defendant took her cell phone away.

Marla testified that, while she was on the floor, defendant pulled her legs apart, put his penis in her vagina, and told her to be quiet when she objected. Marla testified that defendant also put his penis in her mouth, which she moved up and down on his penis because she was scared for her life—defendant had threatened to "cut her teeth out with pliers one by one" if she did not do what he wanted. At trial, Marla was unsure if defendant also put his penis in her anus even though she had previously told a detective that he did—she testified that she could feel the penis somewhere, but did not know where it was.

Marla testified that, on the morning of March 21, 2012, defendant drove her to several places and then took her home. Before he left, defendant wondered out loud what his mother would have thought about what he had done. Once she was in her apartment, Marla noticed injuries to her neck and wrists.

The next day, Marla contacted defendant's brother, Timothy Farmer, and explained what defendant had done. She refused Timothy's offers to take her to the police or the hospital, but allowed Timothy to take pictures with his cellular phone. Timothy testified that Marla was afraid to lose her relationship with Betty and Monique. According to Timothy, when he subsequently approached Betty and Monique with the information Marla had shared, Betty

---

[1] The police recovered a silver knife with a black handle under a cushion on the living room couch.

refused to get involved and Monique was very defensive. Timothy testified that Monique later attempted to influence his testimony at trial, but he ignored her.

When Marla reported defendant's acts to her family, they eventually convinced her to go to the hospital. Anne Adrian, the sexual assault nurse examiner, met and interviewed Marla; Adrian recalled that Marla was reluctant to report the incident because she was concerned about losing her friend (defendant's mother). Adrian photographed bruising around Marla's neck, on her wrists, and on her inner thigh.[2] Adrian did not see any trauma to Marla's genital area or anus, but opined that trauma to the genital area and anus heals very quickly, usually within hours or a day. Although Adrian could not tell if the neck injury was self-inflicted or exactly what caused any of the injuries, she opined the neck bruising could have been caused by a rope or a "shoe string type."

Defendant was charged as a fourth habitual offender with: (1) first-degree CSC (personal injury/digital penetration), (2) first-degree CSC (personal injury/penis-vagina penetration), (2) first-degree CSC (personal injury/penis-mouth penetration), (4) first-degree CSC (personal injury/penis-anus penetration), (5) unlawful imprisonment, and (6) felonious assault. At the preliminary examination, the prosecutor only moved to bind defendant over on counts 2 through 6, noting that Marla's testimony had not supported the charge of Count 1 as to digital penetration. After Marla testified at trial, the People moved to dismiss Count III, involving anal penetration, because Marla was unable to differentiate between her vaginal and anal orifices while testifying. Count II was amended to include either sexual penetration of the vagina or the anus.

During trial, the prosecution opened an investigation of Catherine Farrell, the detective assigned to investigate defendant's case, after it became apparent that Farrell had backdated a supplemental police report concerning her investigation of phone records in defendant's case. The prosecutor only discovered the existence of these phone records after the trial began, and after defense counsel contended in opening statements that the prosecution lacked any phone records to support its case. Farrell invoked her Fifth Amendment right not to testify at defendant's trial. Defense counsel stipulated to the addition of several witnesses to the witness list to testify about Farrell's unavailability to testify, the backdated supplemental report, and the absence of the phone records in the discovery materials before trial. The parties agreed that the phone records would only be admitted for impeachment purposes, but ultimately, the phone records were not admitted into evidence by either party. The trial court gave the following instruction about the phone records to the jury:

> You have heard testimony regarding the existence of cell phone records belonging
> to both defendant and Marla Lade. The substance of these records has not been

---

[2] Marla's mother and Timothy testified that, as a result of a nervous disorder or feelings of rejection, Marla would gnaw on her hands, but any injuries from her self-inflicted gnawing were distinct from the injuries Marla reported that defendant caused. Canty testified that Marla did not just gnaw on her hands, but would pull her own hair, put her hands over her ears and around her neck, and bite her hands.

introduced into evidence. You may not consider these records or infer that they would have been beneficial or detrimental to either the prosecution or the defendant.

The trial court permitted the admission of other-acts evidence involving defendant's 1991 conduct against Linda Thelen. Thelen testified that she had stopped for driving directions and defendant, who Thelen did not know beforehand, helped her and she offered him a ride. As she drove, defendant, who was sitting in the front passenger's seat, pulled out a knife, and poked her leg. Thelen testified that she ended up on a gravel road, next to a wooded area, and that defendant wanted her to "go down on him." Instead, Thelen fought defendant for his knife—her hand and face were cut in the process—and drove away with defendant in the car. When she reached an expressway, Thelen honked her horn for help until she got someone's attention. Defendant jumped out of the car and ran away. On cross-examination, Thelen acknowledged that she had talked several times to the prosecutor about her expected testimony and that the prosecutor had showed her some documents to refresh her recollection. Dan Flint, the detective who investigated Thelen's case, also testified regarding Thelen's identification of defendant and Thelen's statements to Flint regarding defendant's conduct.

While the jury was deliberating on their verdict, Juror #6 disclosed to the trial court that, as he and Juror #7 walked down a hallway toward the jury room, Juror #7 said that he had brought a rope "for show and tell" during jury deliberations that day. Juror #6 saw that Juror #7 was carrying a plastic bag and assumed the rope was inside; he did not actually see it until he was questioned about it by the trial court. After telling Juror #7 that bringing the rope to deliberations was improper, Juror #6 reported the incident to the trial court. When questioned by the trial court, Juror #6 stated that he has seen ropes all of his life and the discussion with Juror #7 about the rope did not influence him in any way regarding the case—he could still be fair and impartial.

Juror #7 explained that he only discussed the rope with Juror #6, that none of the other jurors were present or saw the rope, and that he would not talk to the other jurors about it in the future. Juror #7 told the trial court that he did not conduct any experiments with the rope, that he recognized he made a mistake by bringing the rope to court, and reiterated that he understood deliberations could only involve the evidence admitted in the case. Juror #7 promised that the rope would not influence his decision regarding the verdict in any way.

Defendant moved to have Juror #7 excused, and further moved for a mistrial on the basis that after Juror #7's removal, fewer than 12 jurors would be remaining. Defense counsel asserted that defendant did not believe he could "get a fair trial" because Juror #7 failed to follow the trial court's instructions not to consider information concerning defendant's guilt or innocence other than the evidence properly introduced at trial. The trial court denied defendants motions, concluding that because the rope is a common household item, no experiments were performed, and Juror #7 could faithfully perform his duty as a juror, defendant was not prejudiced.

II

A

First, defendant argues that the trial court abused its discretion by admitting evidence of his prior conduct against Thelen or Marla. We disagree.

A trial court's decision whether to admit or exclude evidence is reviewed for an abuse of discretion. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes. *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013).

MRE 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, that upon request by the accused, the prosecution shall provide reasonable notice in advance of trial, or during trial if the military judge excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Relevant other-acts evidence is admissible unless the proponent's sole theory of relevance is to show the defendant's criminal propensity to prove that he committed the charged offenses. *People v VanderVliet*, 444 Mich 52, 63; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). Accordingly, MRE 404(b) is inclusionary rather than exclusionary. *Id*. at 64 (citation omitted). In *People v Smith*, 282 Mich App 191, 194; 772 NW2d 428, 432 (2009), this Court explained:

> In deciding whether to admit evidence of other bad acts, a trial court must decide: first, whether the evidence is being offered for a proper purpose, not to show the defendant's propensity to act in conformance with a given character trait; second, whether the evidence is relevant to an issue of fact of consequence at trial; third, whether its probative value is substantially outweighed by the danger of unfair prejudice in light of the availability of other means of proof; and fourth, whether a cautionary instruction is appropriate.

1

Defendant claims that the evidence of his conduct toward Thelen was not offered for a proper purpose, but rather to demonstrate his propensity to commit the charged crime. But "evidence of sufficiently similar prior bad acts can be used to establish a definite prior design or system which included the doing of the act charged as part of its consummation." *Smith*, 282 Mich App at 196 (quotation marks and citation omitted). "[T]he result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed." *Id*. (quotation marks and citation omitted). "A high degree of similarity is required . . . but the plan itself need not be unusual or distinctive." *Id*.

In her brief in support of the notice to offer other-acts evidence under MRE 404(b), the prosecutor argued that, in both circumstances, defendant targeted a vulnerable female victim—Thelen was alone and lost; Marla was mentally disabled and in need of the money that defendant promised to return. The prosecutor further argued that, in both circumstances, defendant manipulated the victims with promises of help and then isolated them in a secluded area—taking Thelen to a wooded area and Marla to his house where he lived alone. Finally, in both circumstances, defendant used a weapon to threaten the victims—holding a knife to Thelen's thigh and tying Marla up and holding a knife to her face.

Although defendant challenges the similarity between his schemes, claiming that manipulating victims is a characteristic of sexual assault, in general, and was not a distinctive feature of the crimes involving Thelen and Marla, our Supreme Court has explained:

> "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed *need not be distinctive or unusual*. For example, evidence that a search of the residence of a person suspected of rape produced a written plan to invite the victim to his residence and, once alone, to force her to engage in sexual intercourse would be *highly relevant even if the plan lacked originality*." [*People v Sabin*, 463 Mich 43, 65-66; 614 NW2d 888 (2000), quoting *People v Ewoldt*, 867 P2d 757 (Cal App, 1994) (emphasis added).]

Here too, even though the manipulation of his victims to isolate them may not have been distinctive or unusual, it was nevertheless highly relevant evidence that defendant acted with a plan rather than through a series of spontaneous acts.

Defendant also argues that his conduct against Thelen was not relevant because it occurred decades before the conduct against Marla. As defined by MRE 401, "relevant evidence" is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The fact that defendant employed a similar plan to victimize two women made the fact that defendant victimized Marla more probable. That one event occurred in 1991 and the other occurred in 2012 does little to undermine the relevance of the earlier incident because defendant was in prison for 18 of the years between, with little opportunity to execute a similar plan against a woman.

Finally, we reject defendant's contention that the prosecutor misled the trial court in its motion by arguing that defendant and Marla did not know each other. The prosecutor did not argue that Marla did not know defendant. Rather, she argued that Marla did not know about Thelen. This point was relevant to Marla's vulnerability because she interacted with defendant without knowledge that he was a sex offender.[3]

_____

[3] In his statement of questions presented, defendant states without support in his analysis that the probative value of the evidence of the conduct against Thelen was substantially outweighed by

Next, defendant claims that the trial court abused its discretion by admitting evidence of his prior sexual penetration of Marla. Citing *People v Cane*, 238 Mich App 95; 605 NW2d 28 (1999) and *People v Sheehy*, 31 Mich App 628; 188 NW2d 231 (1971) (involving the admission of acts as res gestae evidence), the trial court ruled that numerous transactions are admissible as evidence of "actus reus."

Generally, the facts and circumstances surrounding the commission of a crime are properly admissible as part of the res gestae without regard to the requirements of MRE 404(b). *People v Delgado*, 404 Mich 76, 83-84; 273 NW2d 395 (1978); *People v Shannon*, 88 Mich App 138, 146; 276 NW2d 546 (1979). Evidence of these acts may be admitted as part of the res gestae if the alleged acts are "so blended or connected with the [charged offense] that proof of one incidentally involves the other or explains the circumstances of the crime." *Delgado*, 404 Mich at 83 (quotation marks and citation omitted). As our Supreme Court explained in *People v Sholl*, 453 Mich 730, 741; 556 NW2d 851 (1996), "it is essential that prosecutors and defendants be able to give the jury an intelligible presentation of the full context in which disputed events took place." In other words, the jury is entitled to hear the "complete story." *Delgado*, 404 Mich at 83. Similarly, in *United States v Hardy*, 228 F3d 745 (CA 6, 2000),[4] the United States Court of Appeals for the Sixth Circuit explained:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense. [*Id*. at 748.]

In this case, Marla's testimony regarding defendant's prior sexual penetration, which the jury could have inferred occurred within the prior three weeks,[5] helped explain not only why Marla initially remained in defendant's car and refused to enter his house when she was waiting for defendant to repay his debt to her,[6] but also why Marla eventually succumbed to defendant's pressure to enter the house and did not flee when defendant left her alone. Because defendant had previously sexually assaulted Marla even though she complained that he was hurting her,

the danger of unfair prejudice. Because defendant failed to provide further explanation, his statement is abandoned. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009) ("Defendant has abandoned this issue by failing to provide any analysis in the text of his brief on appeal.").

[4] While the decisions of federal circuit courts are not binding, they may be persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[5] Defendant presented evidence that he suffered from gastrointestinal problems throughout March and, again, Marla testified that the prior sexual penetration occurred sometime after she spent the night at defendant's house when he was sick to his stomach and before the March 20 rape.

[6] Again, Marla testified, "I wasn't sure if he was going to do sex or whatever that day."

Marla was afraid of what defendant might do if she resisted him again. As our Supreme Court explained in *Delgado*, 404 Mich at 83:

> It is the nature of things that an event often does not occur singly and independently, isolated from all others, but, instead, is connected with some antecedent event from which the fact or event in question follows as an effect from a cause. When such is the case and the antecedent event incidentally involves the commission of another crime, the principle that the jury is entitled to hear the "complete story" ordinarily supports the admission of such evidence. [*Id.* at 83.]

There was no other evidence in the record explaining Marla's fear of defendant, particularly because his family had not revealed the true nature of defendant's criminal background to Marla. Without Marla's contested testimony, the jury would have been deprived "an intelligible presentation of the full context in which the disputed events took place," i.e., the "complete story." See *Sholl*, 453 Mich at 741; *Delgado*, 404 Mich at 83. Accordingly, we conclude that the res gestae evidence was properly admitted.

Defendant finds error in the trial court's reliance on *Cane* and its reference to actus reus when it decided to admit the evidence. In *Cane*, the prosecutor brought a single charge of larceny while using evidence of many transactions to prove that count. Because each transaction was admissible as evidence of the actus reus of the alleged crime, the transactions were not "*other* crimes, wrongs, or acts" under MRE 404(b). The facts of this case are distinguishable from *Cane* because the prior sexual penetration was not admissible as evidence of the actus reus of the charged crime. But to the extent that the prior sexual penetration was so blended or connected with the charged criminal sexual conduct, it was not error to cite *Cane* for the proposition that the prior sexual penetration was not an "*other* act" under MRE 404(b). Furthermore, the jury is presumed not to have considered the prior sexual penetration as the actus reus for the charged offense because the trial court instructed that it was admitted for the limited purposes of judging Marla's believability. The trial court also instructed the jury that defendant's convictions must arise out of the events occurring on March 20. "Juries are presumed to follow their instructions." *People v Rodgers*, 248 Mich App 702, 717; 645 NW2d 294 (2001).

B

Defendant claims several statements introduced at trial were hearsay and their introduction amounts to reversible error. We disagree that any alleged error requires reversal.

MRE 801(c) defines hearsay to be "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." MRE 801(a). Hearsay is not admissible, except as specifically provided by the rules of evidence. MRE 802.

1

First, defendant argues that the trial court abused its discretion by admitting Thelen's statement to Detective Flint under MRE 803(d)(1)(B).

MRE 801(D)(1) provides, in relevant part:

(d) Statements which are not hearsay. A statement is not hearsay if–

(1) Prior statement of witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .

In *People v Jones*, 240 Mich App 704, 706-707; 613 NW2d 411 (2000), quoting *United States v Bao*, 189 F3d 860, 864 (CA 9, 1999), this Court ruled that the party offering a prior consistent statement must establish four elements:

(1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

The declarant (Thelen) was the first witness to testify at trial and she was subject to cross-examination. There was also an implied charge of recent fabrication or improper influence. On cross-examination, defense counsel elicited testimony from Thelen that she and the prosecutor reviewed what she planned to testify about. In addition, defense counsel elicited testimony that the prosecutor showed Thelen documents to refresh her recollection. Defense counsel's questions implied that Thelen's discussions with the prosecutor improperly influenced her testimony about the 1991 incident involving defendant. The prosecutor thereafter offered Detective Flint's testimony about Thelen's statement to him in 1991. Thelen's statement was consistent with her testimony at trial. Last, the 1991 statement preceded—by two decades—the prosecutor's interactions with Thelen in the instant case. Therefore, we conclude that the necessary elements to admit a prior consistent statement were established. The trial court did not abuse its discretion by admitting Detective Flint's testimony about Thelen's statement.

2

Second, defendant argues that the trial court abused its discretion by admitting Marla's statement to Timothy, noting that Marla had not yet testified at the time her prior consistent statements were admitted. Even if MRE 801(D)(1) requires the declarant to testify and be subject to cross-examination regarding a statement before the prior consistent statement can be admitted at trial, any error in the admission of the statement was harmless. An erroneous admission of evidence is presumed to be harmless, and defendant bears the burden of proving otherwise. *People v Lukity*, 460 Mich 484, 493-495; 596 NW2d 607 (1999). This Court only

reverses if, " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *Id*. at 495-496, quoting MCL 769.26. The "examination of the entire cause" encompasses evaluating the error in the context of the untainted evidence. *Id.* at 495.

In this case, Marla's testimony, standing alone, was sufficient to support defendant's convictions. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000); *People v Newby*, 66 Mich App 400, 405; 239 NW2d 387 (1976) ("A complainant's eyewitness testimony, if believed by the trier of fact, is sufficient evidence to convict."). Despite defendant's challenge to Marla's competency when he moved for directed verdict, the trial court found that despite the description of her disability by her parents, Marla had testified competently and was "a very good witness." In addition, the prosecutor did not argue that Marla's statements to Timothy should be used as substantive evidence of defendant's guilt, but instead limited her argument to the chronology regarding when and to whom Marla reported the rape. Finally, the trial court gave the proper limiting instruction to the jury that it should not consider for the truth of the statement itself, those statements admitted only to explain why a witness did something. *Rodgers*, 248 Mich App at 717. Thus, any error in the admission of Timothy's testimony was harmless.

3

Defendant challenges Nurse Adrian's testimony that Marla: (1) identified defendant as the perpetrator and (2) explained that defendant owed Marla money, brought her to his apartment to pay her, and made her stay there. The trial court admitted Adrian's testimony about Marla's statement to her under MRE 803(4). "Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment" are admissible as an exception to the hearsay rule. MRE 803(4); *People v Meeboer* (*After Remand*), 439 Mich 310, 322; 484 NW2d 621 (1992). The rationale supporting the admission of statements under this exception is the existence of (1) the reasonable necessity of the statement to the diagnosis and treatment of the patient, and (2) the declarant's self-interested motivation to speak the truth to treating physicians in order to receive proper medical care. *Meeboer*, 439 Mich at 322. Identification of one's abuser is reasonably necessary to the diagnosis and treatment of the patient. *Id*.

First, Marla's statement to Adrian, identifying defendant as the perpetrator, was reasonably necessary to diagnose and treat her. Defendant's identity was important for determining Marla's risk for acquiring sexually transmitted diseases. It also could have been necessary to separate Marla from her abuser. *People v Van Tassel* (*On Remand*), 197 Mich App 653, 662; 496 NW2d 388 (1992) ("[t]reatment and removal from an abusive environment is medically beneficial to the complainant of a sexual abuse crime"). Moreover, Marla was presumed to understand the need to tell the truth to medical personnel, which would ensure her proper diagnosis and treatment. *Id*. at 661. It was not an abuse of discretion to admit Marla's statement to Adrian regarding the identity of the perpetrator.

Second, it was not outside the range of principled outcomes to admit Marla's statements to Adrian that defendant owed her money, brought her to his apartment to pay her, and made her stay there. The trial court could have concluded that Marla's statements about how she had been manipulated were reasonably necessary to understanding how to approach the examination. Because of Marla's disability, Adrian used techniques that she would use with a child, including open-ended questioning. Regardless, even if these statements were not necessary for diagnosis and treatment, they were cumulative of Marla's testimony and therefore harmless. *Lukity*, 460 Mich at 493-495.

C

Defendant argues the trial court abused its discretion by admitting evidence regarding Marla's relationship with defendant's family. We disagree.

Again, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. It is generally admissible. MRE 402; *People v Roper*, 286 Mich App 77, 91; 777 NW2d 483 (2009).

Marla's mother testified that, as Marla grew up with a disability, she had trouble forming friendships and had a strong need for belonging. Timothy testified that Marla became nervous when she felt excluded by her church friends and defendant's family. The prosecutor argued that, as a result, Marla was motivated to maintain the close relationship she had formed with defendant's family despite high costs attached. The fact that Marla worked for defendant's family without compensation and even took out loans for them made it more probable that Marla would initially fail to report defendant's rape in order to protect the family. In addition, the prosecutor argued that defendant exhibited a pattern of preying on vulnerable victims. That defendant observed Marla's vulnerability to manipulation firsthand with his family made it more probable that defendant would prey on her also.

Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403. Again, all relevant evidence is prejudicial to some extent, and only unfairly prejudicial evidence should be excluded. *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). Nothing in the record indicates that the jury would have given undue or preemptive weight to the testimony about Marla's relationship with defendant's family or that it would have been inequitable for the jury to consider the testimony. Accordingly, the testimony was properly admitted.

D

Next, defendant argues that the trial court abused its discretion by denying the motion for a mistrial as a result of the extraneous influence of Juror #7's rope. We disagree.

This Court reviews a trial court's denial of a motion for a mistrial for an abuse of discretion. *People v Messenger*, 221 Mich App 171, 175; 561 NW2d 463, 465 (1997).

-11-

"[I]t is well established that not every instance of misconduct in a juror will require a new trial. The general principle underlying the cases is that the misconduct must be such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment. A new trial will not be granted for misconduct of the jury if no substantial harm was done thereby to the party seeking a new trial, even though the misconduct is such as to merit rebuke from the trial court if brought to its notice." [*People v Fetterley*, 229 Mich App 511, 544-545; 583 NW2d 199 (1998), quoting *People v Nick*, 360 Mich 219, 230; 103 NW2d 435 (1960).]

To establish that an extrinsic influence is error requiring reversal, a defendant is required to demonstrate: (1) that the jury was exposed to extraneous influence and (2) that the extraneous influence created a real and substantial possibility that it could have affected the jury's verdict, meaning that it was "substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict." *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "If the defendant establishes this initial burden, the burden shifts to the people to demonstrate that the error was harmless beyond a reasonable doubt," either by proving "the extraneous influence was duplicative of evidence produced at trial or the evidence of guilt was overwhelming." *Id.* at 89-90.

First, the entire jury was not exposed to extraneous information. Rather, only two jurors (Juror #6 and Juror #7) were aware that Juror #7 had brought a rope to the courthouse.

Second, Marla's testimony that defendant tied a rope around her neck, which caused bruising observed by other witnesses and documented with photographs, was a material aspect of the case. But defendant has failed to establish a direct connection between the rope brought by Juror #7 and the adverse verdict. The rope was a common household item, with which both Juror #6 and Juror #7 were familiar prior to trial. Neither Juror #6 nor Juror #7 conducted any experiments with the rope. Because all of the jurors were free to consider their general knowledge about ropes during deliberations, see *Hinterman v Stine*, 55 Mich App 282, 285; 222 NW2d 213 (1974); *People v Sesson*, 45 Mich App 288, 294; 206 NW2d 495 (1973), the mere observation of the rope by Juror #6 and Juror #7 was duplicative of their common knowledge about this household item. The extraneous influence would have also been harmless in light of the overwhelming evidence that defendant restrained Marla with a rope, including Marla's testimony, the photographs of the bruising on Marla's neck, and Adrian's testimony that the bruising could have been caused by a rope or "shoe string type."

Again, jurors are presumed to follow their instructions. *Rodgers*, 248 Mich App at 717. Here, the trial court repeatedly instructed the jury that it could only consider the evidence admitted in the case and, when the trial court questioned both Juror #6 and Juror #7, they reported that they could disregard the rope during deliberations. Given the limited exposure of the rope to the jury, that the existence of ropes is common knowledge, that the evidence of Marla's injury was overwhelming, and the trial court's instructions to the jury, the trial court's decision not to grant a mistrial was not outside the range of principled outcomes and did not impair defendant's ability to receive a fair trial.

E

Last, in his brief on appeal, defendant argues that the cumulative effect of the alleged errors requires reversal. We disagree.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Brown*, 279 Mich App at 146. "[O]nly 'actual errors' are aggregated when reviewing a cumulative-error argument." *People v Gaines*, 306 Mich App 289, 310; 856 NW2d 222 (2014). Because defendant has failed to establish that more than one challenge constitute an actual error, there is no error to accumulate in support of a cumulative-error argument.

III

In his Standard 4 brief on appeal, defendant argues that the prosecutor committed error requiring reversal. We disagree.

A defendant must raise the issue of prosecutor error at the trial court level in order to preserve the issue for appellate review. *People v Abraham*, 256 Mich App 265, 274; 662 NW2d 836 (2003). Defendant filed a motion to disqualify the prosecutor before trial, alleging she had a personal vendetta against him because her office had initiated a separate case for failing to register as a sex offender against him. But the prosecutor stated on the record that she did not personally initiate that case, she was actually responsible for its subsequent dismissal, and she was pursuing the instant case against defendant because she believed the evidence would support his conviction. To the extent any prosecutor error that defendant claims on appeal was raised in the motion to disqualify, it is preserved. Any other claims are unpreserved.

This Court reviews preserved claims of prosecutor error on a case-by-case basis and decides whether the prosecutor's comments, taken in context, deprived the defendant of a fair and impartial trial. *People v McElhaney*, 215 Mich App 269, 283; 545 NW2d 18 (1996). In order to require reversal, the defendant has the burden of showing that it is more probable than not that the error affected the outcome of the case. See *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999).

This Court reviews a defendant's unpreserved claims of prosecutor error for plain error affecting substantial rights. *People v Gibbs*, 299 Mich App 473, 482; 830 NW2d 821 (2013). Reversal is not required if a jury instruction could have cured the error. *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003).

1

While defendant argues that the prosecutor failed to offer him a polygraph test until one year following his arrest, he does not argue that he *requested* a polygraph test. Absent a timely request for a polygraph test, defendant was not entitled to one under MCL 776.21(5) ("A defendant who allegedly has committed a crime under [MCL 750.520b to MCL 750.520e and MCL 750.520g] shall be given a polygraph examination or lie detector test if the defendant requests it."). Defendant does not cite any alternate authority requiring the prosecutor to offer a

-13-

polygraph test. Moreover, he offers no evidence that, if he had been given a polygraph test, it is more probable than not that the outcome of the case would have been different. "[E]ven if defendant had taken and passed a polygraph test, the results would not have been admissible at trial." *People v Phillips*, 469 Mich 390, 397; 666 NW2d 657, 661 (2003).

2

Defendant further claims that the prosecutor only prosecuted his case to "gain another conviction [under her] belt." But, under the rules of professional conduct, the prosecutor could only prosecute a case supported by probable cause. MRPC 3.8(a). Here, the district court bound the case against defendant over to the circuit court upon a finding that it was "probable" that defendant committed the charged crimes. MCR 6.110(E). Moreover, at trial, the prosecutor stated on the record that she believed the evidence would prove defendant was guilty, and the trial court found that she was merely zealously representing the People. Regardless of the prosecutor's motivation, that the jury convicted defendant as charged demonstrates the outcome of the case would not have been different.[7]

3

Defendant claims that the prosecutor misrepresented Marla's testimony by making hand gestures to approximate the size of the knife, which did not resemble Marla's hand gestures. Again, this claim is unpreserved and it is unclear from the record whether the prosecutor's gestures differed from Marla's gestures. Even if they were different, defendant cannot establish plain error affecting his substantial rights because the knife was admitted at trial and the jury could independently evaluate its size and Marla's testimony.

4

Defendant argues that the prosecutor also participated in witness tampering. Defendant claims the prosecutor sanctioned note-taking by Marla's parents during trial and then allowed Marla to use those notes when examining her. Defendant's claim is inconsistent with the record. There is no record that her family took notes during trial about other witnesses' testimony, shared them with Marla, or that Marla referred to notes while testifying. Because defendant has not established that the prosecutor used false evidence to convict him, *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009), he cannot establish plain error affecting his substantial rights regarding the prosecutor's elicitation of this evidence.

5

Next, defendant claims that the prosecutor received information from a female sheriff's deputy during a break in trial that defendant had been hospitalized. But because defendant does not argue how this unpreserved claim of error affected his substantial rights, we reject it.

---

[7] Defendant does not challenge the sufficiency of the evidence to support his convictions.

Defendant also claims that another female deputy reviewed jail recordings for the prosecutor and, as a result, the prosecutor announced on the record—on October 24, 2013—that she received information that was "possibly incriminating to the defense." Defendant further claims that, after a break, the prosecutor said on the record that there was "nothing to report." Aside from noting the date this alleged error occurred, defendant does not provide any citation to it on the record. Therefore, defendant's claim is abandoned. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."); "An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339-40; 662 NW2d 854, 856 (2003). But even if the prosecutor had made the statement defendant alleges about the recovery of incriminating evidence, reversal would not be required because the prosecutor later allegedly stated there was "nothing to report" and a jury instruction could have cured the error. *Ackerman*, 257 Mich App at 449.

Defendant further claims that the prosecutor improperly asserted during closing arguments that the jury should listen to the recordings from the jail, because the recordings were never admitted into evidence. Again, defendant's claim is abandoned because he provides no citation to the record. *Houghton*, 256 Mich App at 339; *Kevorkian*, 248 Mich App at 389. But even if the prosecutor made the argument defendant alleges, the trial court instructed the jury only to consider properly admitted evidence and that the lawyers arguments were not evidence. Because the jury is presumed to have followed its instructions, *Rodgers*, 248 Mich App at 717, defendant cannot establish plain error affecting his substantial rights from the prosecutor's alleged statement.

Defendant claims the prosecutor labeled him a "serial rapist and sodomizer." Indeed, at a pretrial motion hearing, the prosecutor described defendant to the trial court as a "serial rapist." But defendant cannot establish that this characterization affected the outcome of the trial because it was not made in the jury's presence.

Next, defendant finds error in the prosecutor's suggestion that Kevin Tyrrell serve as court-appointed defense counsel. Defendant cannot establish plain error affecting his substantial rights from the prosecutor's suggestion because defendant makes no claim that Tyrrell had any conflict of interest or represented defendant inadequately.

Defendant further claims that the prosecutor charged him with a separate crime as retribution for delays his motions had caused in the case. Defendant preserved this claim by moving for the prosecutor's disqualification. But the record demonstrates that the prosecutor had no part in authorizing the filing of the separate charge and she actually told the prosecutor assigned to the case to dismiss it. Defendant therefore cannot prove that this separate charge affected his right to a fair trial in this case.

Defendant argues that the prosecutor erred by adding Monique to the witness list and then refusing to call her to testify. But during the course of trial, allegations were made against Monique that she had been attempting to interfere with witness testimony. At the time the prosecutor rested her case, she requested that the trial court strike Monique from the witness list. The prosecutor stated, "I don't believe she'll be truthful . . . ." Defense counsel also stated he would not call Monique to testify and agreed that she should be released from the subpoena and stricken from the witness list. As a result of defense counsel's agreement, defendant waived any claim of error. *People v Buie*, 491 Mich 294, 305; 817 NW2d 33 (2012) ("Waiver is the intentional relinquishment or abandonment of a known right.") (citation and quotation marks omitted).[8]

Last, defendant challenges the involvement of multiple prosecutors in this case. Although defendant claims the elected prosecutor for Ingham County (Stuart Dunnings) visited the courtroom during trial to bring a note from the media, and defendant fails to provide any citation to the record regarding Dunnings' involvement, his claim is abandoned. *Houghton*, 256 Mich App at 339; *Kevorkian*, 248 Mich App at 389.

Chief assistant prosecutor Lisa McCormick testified and assistant prosecutors Debra Rousseau and Andrew Stevens tried the case. Involvement of several prosecutors was the necessary result of Detective Farrell's misconduct. When the phone records were discovered during trial, defendant could have moved for a mistrial because he had argued, in his opening statement, that no phone records existed. Defendant elected not to make such a motion because, on retrial, the phone records could be admitted. Because the parties agreed to continue the trial, additional witness testimony was necessary to explain Detective Farrell's absence, the backdated

---

[8] Defendant also claims that Marla's father was present during Detective Farrell's testimony (she only testified at the preliminary examination) even though he was a potential witness. At the beginning of the preliminary examination, the trial court ordered all potential witnesses to leave the courtroom. There is no indication in the record that Linden remained. But even if defendant is correct and Linden observed the preliminary examination, defendant does not argue how he was prejudiced as a result. Therefore, defendant cannot establish plain error affecting his substantial rights.

supplemental report, and the absence of the phone records. To that end, defense counsel stipulated to the addition of several witnesses to the witness list (including McCormick). In addition, defense counsel stipulated to Stevens's participation, which the trial court required because Rousseau may have been called as a witness. In light of defendant's agreement to the involvement of these additional prosecutors, defendant cannot now claim error from their presence. *Buie*, 491 Mich at 305.[9]

Affirmed.

/s/ Kurtis T. Wilder
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens

---

[9] To the extent defendant makes additional claims distinct from his claims of prosecutor error, we decline to address them because he provides no citation to relevant supporting authority and we decline to discover and rationalize the basis for his bald assertions of fact. *Houghton*, 256 Mich App at 339; *Kevorkian*, 248 Mich App at 389.